## UNITED STATES v. ROBINSON.
### No. 10131.

Circuit Court of Appeals, Fifth Circuit.

June 26, 1942.

Helen R. Carloss and J. Louis Monarch, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr. Asst. Atty. Gen., and Brian S. Odem, Asst. U. S. Atty., of Houston, Tex., for appellant.

Paul Port, of Houston, Tex., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for refund of income taxes for the years 1934 and 1936. The claim was that gains from timber sales realized in 1934 and 1936 by plaintiff as a member of a partnership, were gains upon the sale of capital assets.[1] The defense was that the gains in question were from "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" within the meaning of Section 117 (b).

Tried to the Judge on an agreed statement of facts and written exhibits, supplemented by the testimony of one witness for plaintiff, there were findings of fact;[2] that

---

[1] Section 117(a) and (b), Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev. Acts, page 707.

[2] As stipulated by the parties as they appear from the exhibits in the case, and as found by the court, the facts may be summarized as follows:

"About 1842 Sandford Gibbs, plaintiff's father, began the operation of a general mercantile business in Huntsville, Texas. As was the custom of the day, in connection with such business, he loaned considerable amounts of money to customers.

Settlements with debtors frequently resulted in the acquisition of acreage. He also invested surplus profits in lands. Gibbs died in 1886 and his widow succeeded to his estate under the terms of his will, which directed the ultimate disposition of his property to his six surviving children. The properties were managed by a son, W. S. Gibbs, until 1916, when in accordance with the will, the widow transferred the estate to the children, who, on December 31, 1916, formed a partnership. The purpose of

practically all of the firm's business was concerned with the management of family properties and the collection and investment of income therefrom; that the timber, from the sales of which the gains in question came, was a capital asset of the partnership, it was not its "stock in trade" or other property included in an inventory, nor was it held primarily for sale to customers in the ordinary course of its trade or business; the sales of timber that were made were casual sales and were not made to regular buyers or customers. Based on these findings there were; conclusions of law, that the timber was a capital asset of the partnership, that the gains from its sale were taxable as

the partnership as set out in the partnership agreement, in effect during the years in question, is stated as follows:

"The purpose of said co-partnership shall be to engage in the lending of money, the buying, holding and selling of lands. notes, claims, and securities of any and all kinds, and property of any and every character, located in the State of Texas, and elsewhere; and said co-partnership shall pursue any lawful business, including the mercantile business, which in the judgment of the manager thereof may be deemed advantageous."

"In 1923, the partnership discontinued its general merchandising business. Since that time it has been engaged in the management, preservation and reinvestment of the properties so acquired, its income being derived from farm and ranch operations, rentals therefrom (including oil and gas), interest received from bonds and other investments, and gain from stock and bond sales and timber sales.

"Included in the properties received by the partnership in 1916 as a part of the estate was approximately 150,000 acres of land, most of which was timbered. The principal value of the land was based upon the timber. Because of the scattered condition of the tracts over a large area, it was necessary from time to time to consolidate in some measure, or block, the holdings. The partnership, therefore, purchased from time to time tracts adjacent to those inherited so as to make better sales of timber from the inherited lands. Additional tracts were also acquired incidental to the collection of debts, pasture blockings, or for investment purposes. Such acquisitions constituted about thirty per cent of the total timber holdings of the partnership, the inherited portion constituting approximately seventy per cent of the whole. Practically no timber has been acquired by the partnership since 1926.

"In 1922, the partnership entered into an agreement with Palmetto Lumber Company, in which the latter agreed to purchase a large portion of timber. The following year, the Oakhurst Lumber Company, acquired the rights of Palmetto and proceeded to cut the timber and pay for same under the contract until the year 1931, when Oakhurst was dissolved. On March 21, 1931, the partnership entered into contracts with Texas Long Leaf Lumber Company, under which the Texas Long Leaf Lumber Company took over the Oakhurst contracts. (Exhibits 'G' and 'H' of the stipulation.) In November, 1935, the partnership entered into four contracts with Peavy-Moore Lumber Company (covering as many separate tracts) for the conveyance of certain tracts of timber owned by the firm in Newton County, Texas (Exhibits 'I' to 'L' of the Stipulation).

"Practically all the gains from timber sales during the years in question were from sales of timber under the contracts with Texas Long Leaf Lumber Company and Peavy-Moore Lumber Company. These companies were engaged in the business of purchasing timber, cutting it into logs and lumber for sale to the public. They were not subject to any control or supervision by the partnership. The timber contracts with Texas Long Leaf Lumber Company and Peavy-Moore Lumber Company were contracts of sale and not of employment.

"The first paragraph of the San Jacinto County contract (R. 53) provides: 'First party has agreed and does hereby agree to sell to second party, and second party has agreed and does hereby agree to buy from first party at the price and upon the terms hereinafter stated, all of the merchantable pine and hardwood timber eight (8) inches and over at the stump when cut hereunder, belonging to first party and standing on lands located in San Jacinto County, Texas * * *'

"The next paragraph fixes the price ($6.50) per thousand feet, payments to begin January 1, 1936; provided that if the purchaser should begin the cutting of any timber prior to January 1, 1936, then each tract should be paid for in full in advance before the cutting thereof. Interest on the purchase price was payable at the rate of 6 per cent per annum from and after January 1, 1936.

"The Walker County contract (R. 65) is similar in form to the San Jacinto County contract. The price in this contract was $4.50 per thousand feet, with provisions for an increase if the market price of lumber increased a certain

capital gains; and that plaintiff should have the refund sued for; and a judgment in accordance therewith.

⬛ Here, the United States urging upon us that the primary facts as stipulated and found by the court below do not support, but on the contrary, negative the ultimate fact finding of the district judge that the timber was a capital asset and was not property held for sale to customers in the ordinary course of the taxpayer's trade or business, insist that the judgment may not stand. Appellee on its part citing Carroll v. Commissioner, 5 Cir., 70 F.2d 806; Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; Commissioner v. Burnett, 5

---

amount. The quantity of timber sold under both contracts was fixed by agreed estimates attached to the contracts. Payments were made in monthly installments on the basis of these estimates regardless of the amount of timber actually cut. (R. 55, 65, 150, 155.) Thus, any growth or loss in the timber subsequent to the making of the contracts and before it was cut, was the gain or loss of the purchaser, the partnership receiving an agreed fixed amount under the contracts. The purchase price was payable in installments, in advance of cutting, it being agreed that an average of at least 1,250,000 feet of timber would be cut each month and paid for in advance. Interest was payable on all monthly installments of the purchase price after due, at the rate of 6 per cent per annum, until paid. Both contracts provided that the purchaser would pay 75 per cent of all taxes accruing on the lands covered, this apparently being the estimated proportion of the entire value of the land allotted to the timber. The lumber company paid such taxes and interest as were due from time to time. (R. 147.) The contracts granted the purchaser certain 'free time' within which to cut and remove the timber, and an additional period of time where needed upon payment of 15¢ per acre. The sales contracts contained other provisions, customary in logging or timber contracts.

"The only member of the firm actively engaged in partnership activities was Dr. J. P. Gibbs, a retired physician, who as managing partner, supervised all employees of the firm and the conduct of its business. Only a negligible portion of his time, or that of any of the employees, was spent in connection with timber sales. The firm did not cut and sell timber or otherwise engage in activities which would characterize a timber business.

"In short, it was not in the timber business or in the business of selling timber or lumber. During the years in question the partnership carried on a substantial farm and ranch business, one of the employees being entirely engaged in supervising the handling of livestock. A large part of its income was from city and country rental properties (75 city houses and 140 tenant farms). At least four of the ten employees were engaged in the collection of rents, supervising tenant farming, and the repair of properties. (R. 98.) Several others were principally engaged in making and collecting loans. The partnership maintained offices in Huntsville, Texas, which were used for making rental and loan agreements and collecting loans and rents. (R. 137.) This place of business was in no way used for the purchase or sale of timber. (R. 138.) The firm carried on a money lending business larger than the two regular banks in the town. (R. 163.) Interest and income from loans and securities also furnished a large portion of its income. The comparative balance sheet of the firm (Ex. I, R. 105), shows that the outstanding notes and accounts receivable due the firm during the years 1933 to 1936 averaged from $250,000 to over $425,000. Having large real estate holdings (approximately 150,000 acres), the partnership carried on extensive oil, gas and mineral leasing activities. Two of the ten regular employees were engaged in taking care of the real estate holdings of the partnership. They devoted most of their time to keeping title records, correcting titles, surveying, and preparing maps and plats, also preparing tax renditions and supervising oil and gas leasing and drilling operations. (R. 99-100.) A very small portion of their time (5-15%) was devoted to the inspection of real estate properties, including timber, checking depredations and attending to casual sales of timber or real estate and pasture leasing. The periodic inspection of the operations under the timber contracts required only half a day once a month. (R. 161.) Aside from such periodic inspections, the only activity of the partnership, in connection with the sale of timber, during the years in question, was the collection of the payments due under the sales contracts. (R. 146.)

"Of the expenses incurred by the partnership during the years in question only a negligible portion was in any way connected with the timber."

Cir., 118 F.2d 659; Blodgett v. Commissioner, 13 B. T. A. 1388; Estate of Stark v. Com'r, 45 B. T. A. 882; Carrie L. Brown v. Com'r, 46 B. T. A. ——, insists that the primary facts not only fully support, they compel, the ultimate fact finding. We agree with appellee. Though this gives further point to the extreme nature of the government's claim here, we .put to one side the fact that the property in question was inherited by appellee, that it was sold by her only in the course and for the purpose of its liquidation, that she is not and never has been personally engaged in any kind of business. We assume for the purpose of this case that the liquidation of the timber could have been conducted in such fashion and under such facts as that, though appellee had no personal connection with any of the activities, it might be held under the theories of representation and of substantial frequency, regularity, and continuity, advanced in some of the cases and pushed to extreme lengths in the Ninth Circuit, [3] that sales of timber made by her agents, though entirely in liquidation, were sales of "property held by her primarily for sale to customers in the ordinary course of her trade or business." But this assumption would not aid appellant. For the district judge, has found as facts, upon evidence fully sustaining him, (1) that the partnership was not in the business of selling timber, and (2) that the timber sold was not held by it for sale to customers in the ordinary course of its trade or business. Of these findings it may be said as was said in Higgins v. Commissioner, supra [312 U.S. 212, 61 S.Ct. 478, 85 L.Ed. 783], of a finding of the Board, that the "facts are not sufficient as a matter of law to permit the courts to reverse the decision of the Board". Indeed we think that the evidence would not admit of any other reasonable conclusion. That appellant appreciates the difficulties in which it finds itself in pressing its contention that the sales were of "property held by the taxpayer primarily for sale to customers in the ordinary course of her trade or business", is made more manifest by its claim that since under Texas law the contracts were executory and title passed only as the timber was cut, the case must be treated not as one of a few isolated sales but as one of thousands of sales in which each lot of timber cut must

be regarded until cut, as having been held for sale to customers in the ordinary course of the business of the taxpayer. This fanciful if not fantastic claim that the timber though under binding contracts for sale, was still the property of the taxpayer held by her for sale to customers in the ordinary course of her business will not at all do. For whatever the legal incidents of the contracts as to questions of title may be, their practical effect was to dispose as between seller and buyer of the timber they dealt with and for the purpose of the statute in question, to constitute them single and isolated sales in bulk, and not successive and continuous sales of property held for sale to customers in the ordinary course of the business of the seller.

The judgment was right. It is affirmed.

---

[3] Commissioner v. Boeing, 106 F.2d 305; Ehrman v. Commissioner, 120 F.2d 607; Welch v. Solomon, 99 F.2d 41; Richards v. Commissioner, 81 F.2d 369, 106 A.L.R. 249; Contrast, Snell v. Commissioner, 5 Cir., 97 F.2d 891; Phipps v. Commissioner, 2 Cir., 54 F.2d 469.