**SPARKS v. UNITED STATES.**

Civ. A. No. 250.

District Court, M. D. Georgia,
Macon Division.

June 10, 1944.

Jones, Jones & Sparks, of Macon, Ga. (C. Baxter Jones and Chas. M. Cork, both of Macon, Ga., of counsel), for plaintiff.

T. Hoyt Davis, U. S. Atty., and Chas. W. Walker, Asst. U. S. Atty., both of Macon, Ga., for defendant.

DEAVER, District Judge.

The foregoing case having been submitted to the Court, without a jury, and evidence having been offered and arguments having been made in behalf of both the plaintiff and defendant, upon consideration of the pleadings and evidence, the Court makes the following findings of fact:

1. Plaintiff resides within the Macon Division of the Middle District of Georgia; defendant is the United States of America;

the amount sued for and in controversy is less than $10,000.

2. Plaintiff timely filed a Federal income tax return for the calendar year 1940, including in net income the sum of $2,975.69, which plaintiff reported as a net taxable gain from the sale of capital assets, being certain lots in a subdivision near the City of Macon, Georgia, known as Shirley Hills Addition.

3. Thereafter, the Commissioner of Internal Revenue ruled that plaintiff had received an ordinary gain from the sale of the aforesaid lots, ruling that plaintiff held them during the taxable year primarily for sale to customers in the ordinary course of his trade or business. The Commissioner further ruled that plaintiff received a recognizable ordinary gain in the exchange of two lots in Shirley Hills Addition for 45 shares of stock of Twin Pine Apartments, Inc. He ruled that the fair market value of the stock received by plaintiff in the exchange was $79.08 per share and that plaintiff received a gain on the exchange in the amount of $2,223.66, the cost of the two lots exchanged having been $1,334.94. Plaintiff had treated this exchange as non-taxable under the provisions of Internal Revenue Code, Section 112(b) (5), 26 U.S.C.A. Int.Rev.Code, § 112(b) (5).

4. Upon the basis of these rulings the Commissioner of Internal Revenue assessed a deficiency in tax in the principal amount of $763.61. This amount with interest, the total principal and interest being $838.98, was paid by plaintiff to the Collector of Internal Revenue in Atlanta, Georgia, on February 17, 1943.

5. Thereafter, plaintiff filed a timely claim for refund for the amount of said deficiency and interest, claiming that the lots in Shirley Hills Addition were capital assets, that the exchange of the two lots for stock of Twin Pine Apartments, Inc., resulted in no recognizable gain because of the provisions of Internal Revenue Code, Section 112(b) (5), and that in any event the fair market value of the stock received in the exchange did not exceed $35 per share. This suit was brought more than six months after the filing of said claim for refund, no action having been taken on said claim for refund in the meantime.

6. During the year 1940 plaintiff sold fifteen and one-half lots in the subdivision known as Shirley Hills Addition, besides the two lots which were exchanged for stock of Twin Pine Apartments, Inc. The

aggregate price of the lots sold was $11,299.20 and their cost was $4,359.40. Commissions paid to brokers on the sales amounted to $988.42, leaving a net profit from sales of $5,951.38.

7. Plaintiff timely filed a Federal income tax return for the calendar year 1941, including in net income the sum of $2,434.76, which plaintiff reported as a net gain from the sale or exchange of capital assets, being certain lots in the subdivision Shirley Hills Addition.

8. Thereafter, the Commissioner of Internal Revenue ruled that plaintiff had received an ordinary gain from the sale of the aforesaid lots, ruling that plaintiff held them during the taxable year primarily for sale to customers in the ordinary course of his trade or business.

9. On the basis of this ruling the Commissioner of Internal Revenue assessed a deficiency in tax in the principal amount of $916.75. This amount with interest, the total principal and interest being $965.45, was paid by plaintiff to the Collector of Internal Revenue in Atlanta, Georgia, on February 17, 1943.

10. Thereafter, plaintiff filed a timely claim for refund for the amount of said deficiency and interest, claiming that the lots in Shirley Hills Addition were capital assets. This suit was brought more than six months after the filing of said claim for refund, no action having been taken on said claim for refund in the meantime.

11. During the year 1941 plaintiff sold thirteen lots in the subdivision known as Shirley Hills Addition. The aggregate price of the lots sold was $11,786.60 and their cost was $4,883.03. Commissions paid to brokers on the sales amounted to $1,145.02, leaving a net profit from sales of $5,758.55.

12. The lots of land sold by the plaintiff during the taxable years involved in this case were parts of an entire tract of 240 acres located in the East Macon District of Bibb County, Georgia, which was conveyed to the plaintiff by deed of gift from his father, W. B. Sparks, in November, 1937.

13. This tract of land had been in the possession and ownership of members of the plaintiff's family since about the year 1895. In 1923, plaintiff's father had subdivided a portion of the tract into three divisions, containing 50 lots; and in that year some of the lots were sold, and a portion of the proceeds of the sale of lots was used to have water mains extended to the subdivided portion of the property. All of the unsold lots in this subdivision were included in the conveyance to the plaintiff, at which time water and power were available to this subdivision, which was called "Lone Oak Drive".

14. In the year 1931, another portion of the property was subdivided by plaintiff's father into a subdivision containing 50 lots and known as "Waverland". An auction sale was held in the summer of 1931 and an attempt made to dispose of some of the lots in Waverland, but no sale was actually made, and no plat of this subdivision was ever recorded. All of the lots in Waverland were included in the conveyance to the plaitniff.

15. For a number of years prior to the deed of gift to plaintiff, his father had been inactive and no efforts were made by him to keep up the improvements which had been made and no sales were made of any of the lots or any portion of the tract, and the existing roadways were in a bad state of repair.

16. Plaintiff's father was holding the property with the belief that it was steadily enhancing in value because it lay adjacent to Shirley Hills, a highly developed residential suburb of the City of Macon.

17. The entire tract of land so conveyed to plaintiff was covered by a security deed in favor of the City Bank & Trust Company, the amount of the outstanding indebtedness at the time of the gift being approximately $7500. This debt had previously been guaranteed to the bank by the plaintiff in order to procure an extension of time within which to enable plaintiff's father to liquidate the debt.

18. Within a few weeks after plaintiff acquired the property, he made a sale of all of the unsold lots in Division "A" of Lone Oak Drive to O. O. Watson, realizing therefrom a small amount of cash, which, together with notes evidencing deferred payments, aggregated approximately $2500.

19. Also immediately after acquiring the property, plaintiff granted to the County of Bibb a 50-foot right of way through said lands for the purpose of enabling the county to construct a roadway connecting Briarcliff Road, which bounded the property on the west and south, with the Old River or Juliette Road, which bounded it on the northeast, and this road was con-

structed by the county in the year 1938. With the exception of this new county road, all other roads through the property were already in existence, though plaintiff did, at his own expense, connect Lone Oak Drive with the new county highway for a distance of approximately 100 yards.

20. After the construction of the new county highway, the plaintiff repaired the road, Lone Oak Drive, putting it in good condition and restoring a washed-out fill. This and the extension of this road to the new county road cost the plaintiff approximately $1000.

21. Also, during 1939, plaintiff had a negro man and woman living on the place clear some of the brush and small growth from the woods along the various roadways through the property and otherwise keep the property in good condition. This was continued in 1940 and 1941, all at a cost to plaintiff of approximately $350.

22. In the year 1940, plaintiff caused one of the existing roadways known as Waverland Drive to be platted with a rotten rock material taken from the banks on Hawthorne Road which were sloped and the slopes grassed in the process. The contract performed the two at a valuation of $1066.49, receiving a conveyance of two lots at an approximate valuation of $1500, paying to plaintiff a balance of $411.83 by check.

23. Plaintiff, after the construction of the county highway, during the latter part of 1938 and early part of 1939, caused a survey to be made of the entire tract, tying in the subdivision Lone Oak Drive, and the subdivision, Waverland, with the new county highway, all at a cost to the plaintiff of approximately $330. Some of the lots in Waverland and the location of some of the proposed roads shown on the original plat of Waverland were changed by the plaintiff. None of these proposed new roads were ever constructed by plaintiff's father nor by plaintiff. What is now Waverland Drive was originally an old farm road occasionally improved and used by the county as a detour or supply road; and Hawthorne Road was constructed by the county.

24. In the year 1939, plaintiff was approached by B. Sanders Walker and Wm. A. Fickling, who advised that the Rental Housing Division of the Federal Housing Administration desired to have constructed in Macon a garden-type apartment house under the FHA insured loan plan, and that a representative of the FHA had selected property of the plaintiff located at the intersection of the new county highway and Hawthorne Road, a county highway, as the best available site for such location. At that time, plaintiff agreed orally with the Messrs. Fickling & Walker that if they were able to procure the construction of such an apartment house at that location, he would convey the necessary land and go into the proposition with them on an equal or fifty-fifty basis, and subsequently the plaintiff, during May of 1939, gave to B. Sanders Walker an agreement to convey the property desired, two lots, to any corporation which might be organized for the purpose of constructing the said apartment.

25. At about that time or just prior thereto, Fickling & Walker, Inc., a corporation, all of the stock of which was owned by the Messrs. Fickling & Walker, was given an exclusive sales agency to sell subdivided lots or other lands of the plaintiff within said tract.

26. In connection with the promotion of the apartment house and with the organization of the corporation to be formed for the purpose of constructing the same, it was subsequently agreed that the plaintiff would perform the necessary legal work for a fee fixed by the Federal Housing Administration and to be taken in the capital stock of the corporation.

27. Also, in connection with the promotion of said apartment house, it was required by the Federal Housing Administration that the lands in the immediate vicinity of the apartment house site would be made subject to building restrictions and other restrictive covenants approved by FHA, and in view of different restrictive covenants which had formerly been applicable to the Lone Oak Drive Subdivision and because of the fact the new County Highway made necessary the relocation of the western portion of the road known as Lone Oak Drive, it became necessary to secure the consent of all other persons who had acquired title to or liens upon lots in Lone Oak Drive not owned by plaintiff, and the plaintiff himself worked out with FHA the restrictive covenants and the consent of the other necessary parties thereto.

28. When plaintiff originally acquired the lands from his father, it was his purpose and intent to improve the same so as to enhance their ultimate value and so as to enable him to make sufficient sales

to liquidate the bank indebtedness, if that were possible. During the year 1938, plaintiff felt that the property might be salable for those who desired acreage tracts, such as that conveyed to O. O. Watson, but no such sales were made, and thereafter plaintiff reached the conclusion that in order to make any sales, it would be necessary to sell lots under the restrictions approved by FHA, so that the owners could build homes with the proceeds of FHA insured loans.

29. The plaintiff participated with Messrs. Fickling & Walker in the organization of the corporation, Twin Pine Apartments, Inc., and with the construction of the said apartment house by that corporation for the purpose of enhancing the value of the entire tract of land owned by him, assurances having been given that upon the construction of said apartment house the new county highway would be paved and that adequate water mains, gas mains, and power lines would be constructed into the property at points where they were not then available.

30. While plaintiff had planned and hoped to make sales of lots or other portions of said lands for the purpose of liquidating the bank indebtedness, his primary purpose not only in going into the apartment house project but in making the other improvements shown by the evidence was for the ultimate enhancement in value of the entire tract, and plaintiff's activities were carried on with that in mind and with the view of making more readily salable some of the property in the Lone Oak Drive Subdivision and in the immediate vicinity of the apartment house for the purpose of liquidating the bank debt.

31. While plaintiff was actually the owner of all of said lands in fee simple, he originally guaranteed payment of the bank debt and subsequently accepted the gift from his father for the purpose of preserving what plaintiff considered to be a valuable family asset. He considered himself as being somewhat in the position of a trustee. He did not use any of the funds or proceeds of any sale, other than for the payment of the bank debt, the improvement of the lands, and the payment of taxes and other expenses, but preserved all of the lands and funds arising therefrom, making certain gifts to his father, and after his father's death in August, 1943, subsequently making a distribution of the lands and other assets among his brothers and sister.

32. The sales of lots in said tract resulted primarily through the activities of Fickling & Walker, Inc., and as a result of the promotion and development of the apartment house, and the general improvement of the property made by the plaintiff.

33. The paving of Waverland Drive in the year 1941, while to an extent promoted by the plaintiff, was actually a mutual arrangement entered into between plaintiff, the County of Bibb, Twin Pine Apartments, Inc., and persons who had purchased lots on Hawthorne Road and Waverland Drive, each paying the cost of the pavement upon a pro rata front-foot basis.

34. During all the years 1938, 1939, 1940 and 1941, plaintiff was a very active attorney at law in the City of Macon, a member of the firm of Jones, Jones & Sparks, and devoted to the practice of law during that period at least as much as, and perhaps more than, what is ordinarily considered full time for a practitioner at the Macon Bar. While plaintiff did devote a relatively small amount of time to the general supervision of the property, most of the work performed by him was office work in connection with restrictive covenants, consents and agreements, and the legal work connected with Twin Pine Apartments, Inc. Plaintiff at no time held himself out as a dealer in real estate, he held no license to sell real estate and he was at no time considered by the public generally as a dealer in real estate.

35. Plaintiff at no time intended to and did not push the sales of property in the subdivision for the purpose of immediate disposition of all the lots at a profit.

36. Plaintiff's activities in connection with these lands were not sufficient to constitute a trade or business during the years in question.

37. Plaintiff did not, during the years 1940 and 1941, hold any of the property in said tract of land primarily for sale to customers in the ordinary course of his trade or business.

38. In the organization of the corporation, Twin Pine Apartments, Inc., plaintiff supplied an equal amount of cash as was supplied by Messrs. Fickling & Walker, and plaintiff conveyed the two lots which were owned solely by him and for which he

received 90 shares of the capital stock of the corporation. Plaintiff immediately transferred to Messrs. Pickling & Walker 45 of such shares, and as all of said parties received amounts of stock in proportion to the cash supplied by them, upon the organization of the corporation the stock was not owned by the shareholders in proportion to the assets conveyed to the corporation, so that the conveyance of the two lots by plaintiff was a taxable transaction.

39. The fair market value of the stock of Twin Pine Apartments, Inc., at the time of its organization, was not more than $35 a share.

## Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter.

2. The organization of Twin Pine Apartments, Inc., was a taxable transaction and plaintiff was subject to tax upon the excess of the fair market value of the 45 shares of stock received by him over the cost of the two lots which he transferred to the corporation.

3. All of the lots, including the two exchanged for stock of Twin Pine Apartments, Inc., were capital assets and were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. All of said lots had been held by the taxpayer for more than twenty-four months prior to their sale and exchange. Therefore, the gain realized by plaintiff was a long term capital gain only 50 percent of which should have been taken into account in arriving at plaintiff's taxable net income under the provisions of Section 117 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 117, as applicable to the calendar years 1940 and 1941.

4. The Commissioner improperly disallowed plaintiff's claims for refund.

5. Plaintiff is entitled to judgment in accordance with these findings of fact and conclusions of law, and judgment will be entered accordingly.

## Judgment

It is thereupon, considered, ordered and adjudged that the plaintiff do have and recover of the defendant, the United States of America, the principal sum of $822.07 for the year 1940, and $963.62 for the year 1941, or a total of $1,785.69, besides interest at 6 percent per annum from February 17, 1943, to a date preceding the date of the refund check by not more than thirty days, and the costs of this action to be taxed by the clerk.