**FAHS v. CRAWFORD et ux.**

No. 11664.

Circuit Court of Appeals, Fifth Circuit.

April 25, 1947.

Robert R. Reynolds, Jr., Sp. Asst. to Atty. Gen., and Sewall Key, Acting Asst. Atty. Gen., Herbert S. Phillips, U. S. Atty., of Tampa, Fla., and Edith House, Asst. U. S. Atty., of Jacksonville, Fla., for appellant

Harry T. Gray and Philip S. May, both of Jacksonville, Fla., for appellees.

Before SIBLEY and LEE, Circuit Judges, and STRUM, District Judge.

STRUM, District Judge.

The problem here is whether certain profits accruing to the taxpayer during the years 1940 and 1941 should be taxed as ordinary income, as defined in 26 U.S.C.A. Int.Rev. Code, § 22, or as gains from the sale of capital assets, as defined in 26 U.S.C.A. Int. Rev.Code, § 117. Contending that the profits arose from the sale of capital assets, the taxpayer declared and paid on that basis. The Collector, insisting that the profits accrued from the sale of lands held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business, and hence excluded from capital assets by the definition of Sec. 117, assessed the profits as ordinary income. The taxpayer paid the additional assessment under protest, sued for and recovered it in the District Court. The Collector appeals.

The taxpayer is a lawyer. Admitted to the Bar in 1906, he has since carried on an active and continuous law practice, having no other trade, business, or profession, unless the transactions here involved constitute an additional business. Aside from his home, and four city lots originally taken as security for debts, the taxpayer has purchased no real property since 1926. He did not ordinarily buy, sell, or deal in real estate, either for himself or as agent for others. He had no business office other than his law office; he had no real estate broker's license, nor did he pay any occupational tax as such, nor did he advertise or hold himself out as a dealer in real estate, nor as anything other than a practicing attorney.

Some time prior to 1915, the lands here involved were platted into a subdivision and offered for sale by San Jose Company, in which company the taxpayer had no interest. Except for limited water service, a paved highway running through the property, and one or two graded but unpaved streets, there were no improvements on the property. The project was unsuccessful, only 15 out of a total of 392 lots being sold. In July, 1925, the taxpayer and several associates purchased the subdivision, in solido, from San Jose Company, as a speculative investment, title being taken in the name of City Realty Company. This was at a time when many other investors were speculating in lands, the so-called Florida land boom then being at its peak.

In October, 1925, the taxpayer and his associates executed a contract of sale for the property as a whole to a speculative syndicate, but the contract went into default and the sale was never consummated. Soon thereafter the taxpayer and associates gave one Griner, a real estate dealer, a contract to sell the lots at retail. This attempted method of sale, though apparently successful in the beginning, ultimately proved unsuccessful. Legal title to the property rested from time to time in divers corporations controlled by the taxpayer and associates, but ultimately the taxpayer and his two remaining associates took the title individually in 1938, at which time the taxpayer owned an 8/15 undivided interest. During 1932 the taxpayer and his co-owners re-platted a portion of the property in order to conform the lots to a new road which was extended through the property, and a portion of the property was temporarily re-converted into acreage to save taxes. It was later re-platted into lots. From 1925 until 1938, the owners held the property for sale as a whole, without success, there being no market for the property, either at wholesale or retail.

Late in 1938 Charles E. Commander, Jr., a building contractor, real estate broker and developer, suggested to the owners that the lots might be sold at retail if dwellings, financed by FHA insured mortgages, were built thereon and a demand for the property thus created. Commander proposed to the owners that he (Commander) would perform all the work necessary to secure approval of these lands for FHA loans, if the owners would grant him the exclusive right to buy, or to sell to others, all or any of the lots, according to a price schedule submitted by him, Commander to receive a 10% discount from the list price if he purchased lots for his own account, or a 10% commission if he sold to others.

The owners agreed to this proposition, and Commander prepared the application and all required exhibits, paid all expenses and performed all work incident to the FHA application. The application was approved subject to the requirement that water be made accessible to all lots, and that the streets on which the lots fronted must be hardsurfaced. Through the efforts of the owners and Commander, the City of Jacksonville extended its water mains and electric lines to the property without cost to the owners. Commander secured bids for surfacing the streets on which the lots fronted (other than San Jose Boulevard, which was already paved) and supervised the carrying out of the work. The owners authorized this work. Its cost, aggregating about $16,000, was paid with money received from sales of the lots.

During 1940 and 1941, Commander purchased for himself, and built dwellings upon, 37 of the lots most of which he re-sold. Fifty-eight additional lots were sold through Commander to other building contractors, who were engaged in building homes for sale. They purchased the lots, erected a dwelling thereon, and re-sold the same to an ultimate purchaser. The owners of the land had no part in these building operations, nor in the resales, nor did they share in the profit or loss therefrom. They merely received the net purchase price of the lots themselves. The building operations were financed and carried on wholly by Commander and others who purchased lots through him.

Section 117 of the Internal Revenue Code (26 U.S.C.A. Int.Rev.Code, § 117) provides that the term "capital assets" means property held by the taxpayer, but does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." To fall within the excluded category, the property must not only be held by the taxpayer "primarily for sale to customers," but it also

must be for sale "in the ordinary course of his trade or business."

 Of course, a person may be engaged in more than one business, and may carry on his business through others. Carrying on a business, however, implies an occupational undertaking to which one habitually devotes time, attention, or effort with substantial regularity. Merely disposing of investment assets at intermittent intervals, without more, is not engaging in business, even though some preliminary effort is necessary to render the asset saleable. Snell v. Commissioner, 5 Cir., 97 F.2d 891.

Clearly, these lands were originally purchased by the taxpayer as an investment. Though already platted into a subdivision, the lands were purchased en bloc, and the owners attempted to sell them as a whole. Failing, they tried sales at retail through a broker. This effort met with but small success. From 1925 until 1938 they again held the lands for sale as a whole, without success. It was then they were approached by Commander with the method of sale above described. Nothing could be done until the property was approved for FHA loans, and a condition of that approval was water, lights and paving. These the taxpayer and Commander set out together to secure, in order to render the property saleable,—the taxpayer in order to dispose of his investment,—Commander in order to earn profits in his business as a building contractor, real estate broker and developer, in all of which activities there were prospective profits for him. In effect, what the taxpayer was doing was to render more attractive a capital asset already owned, in order to sell it, in much the same way as an owner would paint and redecorate an old house, and landscape the grounds, in order that his broker could more readily dispose of it for him. These activities were but preliminaries. After FHA approval of the lands had been secured for loans, the taxpayer devoted no part of his time to any activity connected with the sale or development of the lots. This selling was carried on independently by Commander, without any supervision or control by the taxpayer.

The facts here differ from those in the cases relied on by the Collector, such as Greene v. Commissioner, 5 Cir., 141 F.2d 645, where the taxpayer was an active, continuous and well-known dealer in oil properties, was a licensed broker, and the sales related to his usual activities as such; McFaddin v. Commissioner, 5 Cir., 148 F.2d 570, in which unimproved lands were acquired for the specific purpose of development into a subdivision and sale by the taxpayer, that being one of the usual and normal activities of the taxpayer; Brown v. Commissioner, 5 Cir., 143 F.2d 468, where the facts were in principle like the McFaddin case, and Snell v. Commissioner, 5 Cir., 97 F.2d 891, where the taxpayer, a well-known and licensed dealer in real estate, was actively in the business of developing wild land, improving and subdividing it, and selling it off in lots.

Here, the taxpayer did not develop wild lands into an improved subdivision and sell it off at retail, as in many of the cited cases. He bought an entire existing subdivision as an investment, and after holding it for 15 years added further improvements necessary to qualify it for FHA loans. The selling activities were carried on wholly by the broker, Commander,—not as a representative of the taxpayer, but in the exercise of his rights under the single contract he had with the owners to buy at a 10% discount, or to sell to others for a 10% commission. These selling activities were carried on by Commander as a part of his own real estate business, for his own account and at his own expense, the taxpayer having no part therein. As Commander sold or purchased the lots, the taxpayer did no more than to receive the purchase price and execute deeds. The taxpayer personally made no sales. In essence, the taxpayer here has done no more than hold land purchased by him as an investment, qualify it for FHA loans so that it would sell, and accept the purchase price and execute deeds therefor as it was purchased or sold by Commander. This is not enough to put the taxpayer into the real estate business. It amounts to no more than converting a capital asset into cash.

 As the evidence would sustain no reasonable conclusion other than that the gains in question arose from the sale of capital assets, the trial judge correctly directed a verdict for the taxpayer. Pope

318

v. Commissioner, 6 Cir., 77 F.2d 599; Phipps v. Commissioner, 2 Cir., 54 F.2d 469; United States v. Robinson, 5 Cir., 129 F.2d 297; Pope v. Commissioner, 6 Cir., 77 F.2d 599; Croker v. Helvering, 67 App.D.C. 226, 91 F.2d 299; Sparks v. United States, D.C., 55 F.Supp. 941.

Affirmed.

LEE, Circuit Judge (concurring).

Commander was a real estate broker and developer, as stated in the majority opinion. Under his contract with the taxpayer, Commander developed and sold, and interested other building contractors in developing and selling, homes in the subdivision financed by FHA-insured mortgages. The taxpayer was paid only the appraised value of the lots on which dwellings and outhouses were located. The business consisted of improving property in the subdivision, then selling the improved property under the FHA plan. Commander and the other building contractors were in that business, not the taxpayer. Commander under his contract had the control of the lots: he could take over one or all of the lots, separately or collectively. He and the contractors profited or lost by the activities. Beyond the appraised value of the naked lot forming part of the homesite sold, the taxpayer was without interest. Under these circumstances, the property held by the taxpayer was not primarily for sale to customers in the ordinary course of his trade or business.