**LOMAS & NETTLECON FINANCIAL CORPORATION**

v.

**UNITED STATES of America.**

**Civ. A. No. 3–75–0047–C.**

United States District Court,
N. D. Texas,
Dallas Division.

March 13, 1980.

Richard A. Fogel, H. Edward Dobroski, J. J. French, Jr., and Wayne O. Woodruff, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for plaintiff.

William W. Guild, Atty.-in-Charge Lawrence R. Jones, Jr., Dallas, Tex., Joseph E. Earnest, Scott P. Crampton, Asst. Atty. Gen., Martin B. Whitaker, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

This is a suit for the refund of assessed tax in the sum of $1,462,585.44, assessed interest in the sum of $356,105.18 and statutory interest which was paid by Plaintiff for the taxable years ending December 31, 1967, June 30, 1968, June 30, 1969 and June 30, 1970. Jurisdiction has not been contested and is apparent.[1]

There are four legal issues presented for adjudication. The Defendant's Trial Brief expresses them at pages 1 and 2 as:

1. Whether Plaintiff is entitled to capital gains on the sale of certain property owned by it?
2. Whether the Plaintiff must report interest income accrued but uncollected on debts owed to it?
3. Whether the Plaintiff properly charged off as wholly worthless a debt owed to it?

4. Whether an affiliated corporation must report the full face amount of a note received on the sale of property?

The first question involves two properties. The first of which is a tract in the San Fernando Valley foothills near Los Angeles, California, and known as the "Woodland Hills" property. The second is a tract of 43 unimproved acres in Garden City, Long Island, New York, next to the Roosevelt Field Shopping Center, and called the "Roosevelt Field" property.

Questions two and three are concerned with the financial dealings involving approximately 12,000 acres of land in West Baton Rouge Parish, Louisiana, which will be referred to as the "HEP/Richfield" property and indebtedness.

The fourth question relates to the Lake North Apartments in Dallas, Texas, which were sold August 1, 1967, by a wholly owned subsidiary of Plaintiff, L&N Properties, Inc.

### I.

#### Capital Gains

In this controversy, we are concerned with "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" exception to the definition in the Internal Revenue Code of capital assets.[2] The statutory language is, of course, also the test by which it is determined whether a transaction has resulted in an ordinary or a capital gain. The Court of Appeals for the Fifth Circuit has set out seven factors to be considered in determining if a transaction fits within or without the scope of § 1221(1). Those factors, as listed in *United States v. Winthrop*,[3] are: (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and

---

1. 28 U.S.C., Section 1346(a)(1).

2. 26 U.S.C. § 1221(1).

3. 417 F.2d 905, 910 (5th Cir. 1969).

advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. The numbering indicates no hierarchy of importance.

The Fifth Circuit, En Banc, expounded quite fully on this area of law in the case of *Biedenharn Realty Co., Inc. v. United States.*[4] The *Biedenharn* opinion cites at 415, with approval, language from *Thompson v. Commissioner.*[5] The En Banc opinion said: "[Litigants are cautioned that] each case must be decided on its own peculiar facts. . . . Specific factors, or combinations of them, are not necessarily controlling."

■ So we must examine the Woodland Hills and Roosevelt Field situations separately to parse the applicable law.

A. The Woodland Hills Property

In 1960, Plaintiff was incorporated as a Delaware Corporation under a different name. It started business when the original stockholders exchanged cash and various pieces of real property for stock in Plaintiff. That same year, Plaintiff made a public offering of its stock and debentures. The offering circular stated that a major activity of Plaintiff would be the development of land in growth areas.

Part of the proceeds of the offering were used by Plaintiff to exercise an option to acquire the Woodland Hills Property. At that same time, two wholly owned subsidiaries exercised an option to buy a tract of land in Richardson, Texas, known as the "Canyon Creek Property."

By the end of 1963, the subsidiaries had developed a portion of the Canyon Creek Property and transferred the remainder to another corporation owned in part by Plaintiff and in part by other land developers.

During that same time period, Plaintiff sold off parts of the Woodland Hills Property in 12 transactions. These sales were accomplished without development, advertising or solicitation. The remaining property was situated at higher elevations and in more rugged terrain and could not therefore be developed as easily as the 12 parcels previously sold.

These two tracts were the only two that were acquired voluntarily by Plaintiff between 1960 and 1970.

Plaintiff had started in the mortgage banking business with the acquisition of another corporation in November, 1960. By the end of 1963, it had acquired the Lomas & Nettleton Company which at that time was one of the largest mortgage bankers in the country.

Late in 1963, Plaintiff was in serious financial difficulty. Plaintiff's principal creditors put severe restrictions on Plaintiff's activities. Plaintiff was encouraged to get out of its low yield investments such as the Woodland Hills Property. This financial crisis lasted until the middle of June, 1967, when the restrictions were lifted.

The creditors forced a change of management in the Fall of 1965. Of course, this new management was more in tune with the creditors' ideas as to what business Plaintiff should conduct and in what manner it should be conducted.

Because of these events, it can safely be said that it was the intent of Plaintiff by no later than the end of 1965 to get out of the land development business.

In 1965, Plaintiff engaged the services of a land planner, William L. Periera & Associates. What resulted was a report that contained a conceptual plan for the remainder of the Woodland Hills Property. This plan was not a detailed development plan. It was an overview of how best advantage could be taken of the land.

Soon after the turn of the year to 1966, Plaintiff began attempts to sell the Wood-

---

**4.** 526 F.2d 409 (5th Cir. 1976).

**5.** 322 F.2d 122, 127 (5th Cir. 1963).

land Hills Property. The land use report was used in attempts to solicit buyers for the property. But no advertising was used. It is apparent that the persons and entities solicited were not ultimate owners and users but other institutional investors and developers. Besides the attempts made by Plaintiff's officers and employees to sell the property, attempts were made on Plaintiff's behalf by the prior owner of the property and other agents.

A sale of part of the acreage was made in March, 1967. This sale was to a partnership called Tarzana Development Company. The partners were Galaxy Properties, Inc., which was controlled by two land developers and L&N Galaxy, Inc., a subsidiary of Plaintiff. The lender required that each party put $400,000 into the venture which was done. Plaintiff also made a loan of approximately $2.2 million to the partnership to be used in developing the property.

The active development of the property was by the two investors who controlled Galaxy Properties, Inc. Plaintiff and its subsidiary's role was limited to providing financing.

Plaintiff made a small sale of a 1.5 acre lot on November 22, 1968, for $11,000. This small plot was not contiguous to the other Woodland Hills Property.

On June 30, 1969, the remainder of the Woodland Hills Property, except for 70 acres, was sold. The 70 acres were still held by Plaintiff at the time of trial.

This third sale was reportable in 1969, but Plaintiff elected to report the gain under the installment method and no installments were collected during the years that are presently in issue.

It should be noted that out of the approximately 1,110 acres that remained at the end of 1965, all but the 70 acres were sold in three sales, one of which was inconsequential.

■ The Fifth Circuit in part IV of Biedenharn, supra,[6] discussed change of purpose for holding real property. The Court stated that such a change could happen and the tax consequences could change accordingly. But the En Banc Court also said that those cases would be few.

The Fifth Circuit affirmed, per curiam, the decision of the Tax Court in the case of *C.I.R. v. Pontchartrain Park Homes, Inc.*[7] This was a case where a plot of land was bought for the purpose of developing it and selling it to individual lot owners. After part of it was developed, it became apparent that it was infeasible for that entity to develop the remainder of the property. Subsequently, a 17 acre tract was sold for cash. The Tax Court held and the Fifth Circuit affirmed that the gain from this sale should have been treated as a capital gain. The rationale was that the sale was not in the ordinary course of business. Unanticipated factors had made it difficult or impossible to develop the remaining acres as originally planned.

■ The Woodland Hills situation is comparable. Plaintiff had found that the development of the remaining acres would be exceedingly difficult and that it did not have the expertise that would be needed to develop it. Also the financial crisis and the imposition of restrictions by Plaintiff's creditors would have made it impossible for Plaintiff to develop the land in any event.

So we see that the gain that resulted from the pertinent sales was not because of developmental, promotional and solicitation of ultimate owners activity by or on behalf of Plaintiff. The gain resulted from the natural accretion of value caused by the passage of time which is what Congress intended to be taxed as a capital gain.

B. The Roosevelt Field Property

Prior to August 30, 1963, Plaintiff was the lendor of the total of $2,100,000 to Webb & Knapp, Inc., which note was secured by fourth and fifth mortgages on the Stanhope Hotel in New York, New York. On that date, Plaintiff exchanged its inter-

---

6. At 420–422.

7. 22 TCM 437 (1963), 349 F.2d 416 (5th Cir. 1965).

est in that loan and those mortgages for 49.64% of the stock of Land Value Corporation. The majority interest in Land Value was held by Allegheny Corporation.

Land Value's only asset was a tract next to the Roosevelt Field Shopping Center in Garden City, Long Island, New York, consisting of 43 unimproved acres.

This tract was encumbered in several ways. First, it was very restrictively zoned. These restrictions made it uneconomic to develop the land. Plaintiff's predecessors in interest had attempted to have the zoning changed but were unsuccessful because the residents of Garden City wished for that tract of land to exist as a buffer between their homes and the commercial development in the neighboring city of Hempstead in which the Roosevelt Field Shopping Center was located.

Second, development of this tract was restricted by provisions in the leases with two major department stores in the shopping center and by deed restrictions limiting the use of the land.

Third, not all of the 43 acres was usable because of the set back provisions in the zoning, the location of a recharge basin on the property and plans for a road across the property at some uncertain point.

Plaintiff and Allegheny Corporation fell into dispute in 1964. Because of its subordinate position, Plaintiff was compelled to take a series of actions to protect its interest which culminated in its purchase of Allegheny's interest in Land Value in March of 1966. After this, Land Value's name was changed to Roosevelt Office Center, Inc.

Plaintiff gave its note to Allegheny Corporation in exchange for the Land Value stock. The agreement underlying the transaction specified that as long as the note was outstanding that Plaintiff would use its best efforts to sell the property in an amount that would allow full payment of the note and that Allegheny's consent was required before any proposed sale was carried out.

In 1965, a real estate consultant had determined that the best use of the Roosevelt Field Property would be the construction of an apartment, hotel and office complex. But, of course, this was completely infeasible because of the zoning restrictions. In March of 1966, Fishman Construction Company was hired by Plaintiff to assist in getting the zoning for the property changed. Fishman was hired because of its expertise in local developments and the expertise of the professionals it employed in such endeavors. As part of this agreement, Fishman was granted an option to purchase which apparently was never exercised.

After the zoning was changed in early 1968, Plaintiff did advertise the property for sale in bulk for the first time. About that time, Plaintiff was approached by an independent real estate broker. This led to a sale of the land to an entity called Woodmere Knolls, Inc., controlled by Lawrence Lever. Upon the final lifting of the zoning restrictions and those restrictions imposed by the department stores, a sale was closed for the northern 10 acres of the property. There was also an option granted in the contract of sale for the rest of the property.[8]

After it was determined that the new road would not interfere with Mr. Lever's plans for the site, Woodmere Knolls, Inc., exercised the option for the remaining acreage in June, 1969.

The Fifth Circuit said long ago:

"Merely disposing of investment assets at intermittent intervals, without more, is not engaging in business, even though some preliminary effort is necessary to render the asset saleable."[9]

■ If we take this into account as we peruse the *Winthrop* factors, supra, we see that the gain from the Roosevelt Field Property is of the nature of a capital gain.

---

8. A small tract of 2.5 acres had been sold in 1965, a year not in question. This sale is inconsequential to the present discussion.

9. *Fahs v. Crawford,* 161 F.2d 315, 317 (5th Cir. 1947).

First, the acquisition of the property was an involuntary transfer of one capital asset for another. Second, there was no attempt to sell the property other than in its undeveloped, bulk form. Third, the changing of the zoning was a preliminary effort as allowed by *Fahs v. Crawford*, supra. Fourth, there were only two sales, one which was inconsequential. Fifth, there was no subdividing. Sixth, no business office or sales force were used to sell the property. And, seventh, the acquisition and sale of this property was purely incidental to Plaintiff's business of mortgage banking.

In relationship to the discussion of both properties, it should be noted that Plaintiff's dealings with real estate have been very small compared to its total business. It is true that many if not most large corporations engage in more than one line of business. But it does not appear that Plaintiff was engaged in the real estate business after 1965. The Canyon Creek and Woodland Hills Properties were the only two properties acquired between the Plaintiff's founding and 1970 with the intent to develop and sell them. All other properties were acquired incidentally to the mortgage banking business of Plaintiff, just as the Roosevelt Field Property was acquired.

■ In the instance of a large corporation, a showing that income from the sale of real estate was very small as compared to total income is probably meaningless. What may be small in relative terms may be large in absolute terms. The real question is whether or not the taxpayer was carrying on a real estate business? In this particular instance, the evidence shows that for the years in question, Plaintiff was not in the real estate business.

## II.

### Accrued Interest and Worthless Debt

Both of these issues will be discussed together as they are related to one transaction involving 12,000 acres of land in West Baton Rouge, Louisiana. This transaction is very involved so in order to keep the facts straight, the pertinent stipulations of the parties as to this transaction will be set out next:

18. In May 1966, Plaintiff arranged for Sotan, Inc., and Southern Land Title Corporation to secure a $5 million installment loan from Mercantile National Bank of Dallas, with the final installment on the note due April 28, 1971. The note was secured by a first mortgage on approximately 12,000 acres of land in West Baton Rouge, Louisiana.

A second lien was placed on the same property for $3 million, represented by six notes as follows:

(a) $625,000 to Lomas & Nettleton (for funds advanced).

(b) $750,000 to Lomas & Nettleton (profit note).

(c) $208,333 to Diversified Capital, an unrelated, unincorporated association (for funds advanced).

(d) $416,667 to Diversified Capital (for funds advanced).

(e) $333,333 to Diversified Capital (profit note).

(f) $666,667 to Diversified Capital (profit note).

Sotan, Inc., and Southern Land Title Corporation were the obligors on the notes.

19. In addition to the noninterest bearing profit notes, Plaintiff charged a fee of $141,250 for placing the loan. The fee was paid by $115,000 in cash and a note in the amount of $26,250 by Sotan, Inc., and Southern Land Title Corporation due 90 days after May 12, 1966. Lomas & Nettleton reported the fee of $141,250 and the $750,000 profit note as income on its 1966 tax return.

20. After two months, Sotan, Inc., and Southern Land Title Corporation defaulted on their obligation on the first mortgage to Mercantile National Bank.

21. HEP Development Corporation (hereinafter referred to as HEP) was organized in September 1966 by Plaintiff and Diversified Capital, the latter being a partnership composed of Julius Epstein and A. N. Pritzker of Chicago, Illinois. Plaintiff and Diversified Capital each owned 50 per-

cent of the stock of HEP. On September 26, 1966, HEP acquired, in lieu of foreclosure, the property of Sotan, Inc., which secured a $5,000,000 first lien note to Mercantile National Bank at Dallas and which additionally secured second lien notes to Plaintiff and Diversified Capital totalling $3,000,000 (which included the $750,000 note to Plaintiff). Subsequently, Plaintiff and Diversified Capital formed Richfield Corporation, a Texas corporation, owned 50 percent by each, and caused HEP to convey the property to Richfield Corporation.

22. Sotan, Inc., and Southern Land Title Corporation held an option to repurchase the property at any time prior to January 28, 1967, for an amount equal to HEP's aggregate cost plus $125,000. The option was not exercised.

23. On September 26, 1966, HEP acquired, in lieu of foreclosure, the property which secured the indebtedness to Mercantile, Plaintiff, and Diversified Capital, subject to such indebtedness. In connection with such acquisition, Plaintiff, C. Ellis Henican, and HEP entered into an agreement to forbear, dated September 26, 1966, in which Plaintiff agreed that it would not accelerate the indebtedness to Plaintiff, nor commence proceedings to foreclose its lien, nor call upon Henican to pay the indebtedness which he guaranteed until May 28, 1967. The agreement further provided that, if Mercantile took no action to accelerate or foreclose, Plaintiff would continue to forbear until September 26, 1967. In consideration of Plaintiff's forbearance, Henican agreed to pay to Plaintiff $20,000 per month for 11 consecutive months, to be applied to the payment of the amount due on the Mercantile note. Henican made four such payments and then defaulted on the payment due February 25, 1967. The agreement also provided that HEP was to have full control of the management, operation, use, development, marketing, or other disposition of the property, and that Plaintiff may advance funds to HEP for such purposes. Any interest, fees, expenses, and charges incurred by Plaintiff in connection with the borrowing of funds for such advances were also considered as funds advanced for such purposes. All such advances were to be repaid to Plaintiff, together with interest at the rate of 12 percent per annum, compounded annually from the date of such advance. Also included as advances for such purposes was a reasonable charge for that portion of Plaintiff's overhead properly allocable to the servicing and handling of the Mercantile note and mortgage and the notes and mortgages of Plaintiff and Diversified Capital, and the advice, supervision, consultation, and services performed by Plaintiff in connection with the property. The advances set forth above were made to HEP pursuant to the foregoing authorization and terms of the agreement to forbear and included advances for legal and accounting charges, working capital and operations, property taxes, and general and administrative expenses.

24. Since September 26, 1966, when HEP acquired the property, Plaintiff paid the installments due on the first mortgage note to Mercantile Bank and continued to advance operating monies to HEP and then to Richfield.

25. Since September 30, 1966, Plaintiff has not accrued interest income on the principal and interest paid on the Mercantile note, on the $625,000 Sotan note, or on other advances made to HEP-Richfield.

26. After Sotan, Inc., went into bankruptcy in 1967, the trustee for Sotan threatened to set aside the sale of the property to HEP. After negotiations, the trustee was granted an option to reacquire the property at any time prior to July 31, 1969, for $7,600,000, plus interest, insurance, and ad valorem taxes, which was $400,000 less than the aggregate principal amounts due Plaintiff and Diversified Capital. This option was never exercised.

27. As of June 30, 1968, the indebtedness to Plaintiff secured by the property was as follows:

(a) $625,000 note for fund advanced.

(b) $750,000 profit note.

(c) $26,250 note placement fee.

(d) $1,500,000 payment to Mercantile Bank on the first mortgage.

(e) $686,776.61 accounts receivable.

(f) $9,717.36 accounts receivable.

28. From the time that HEP acquired the property (September 26, 1966), the six above-mentioned debts became debts of HEP (and subsequently Richfield). Plaintiff made payments on the $5,000,000 debt of HEP to the Mercantile National Bank and HEP thereby became indebted to the Plaintiff as follows:

| Installment | Date |
|---|---|
| $ 500,000 | 4/28/67 |
| 500,000 | 10/30/67 |
| 500,000 | 4/29/68 |
| 500,000 | 10/31/68 |
| 500,000 | 4/28/69 |
| 500,000 | 11/18/69 |
| 500,000 | 4/28/70 |
| 500,000 | 10/26/70 |
| 1,000,000 | 10/28/71 |

Finally, Plaintiff made other advances to HEP for operating expenses, and HEP (and subsequently Richfield) thereby incurred still further indebtedness to Plaintiff.

29. On its return for the fiscal year ended June 30, 1968, Plaintiff charged against its reserve $750,000 as a bad debt on the $750,000 debt owing to it from HEP. Plaintiff did not charge any of the other debts owed to it by HEP against its bad debt reserve.

30. The Plaintiff did not accrue any interest income on the interest-bearing obligations owed to it by HEP or Richfield for the periods 1967, fiscal year ended June 30, 1968, fiscal year ended June 30, 1969, and fiscal year ended June 30, 1970. The Plaintiff received no interest income from HEP or Richfield in the periods mentioned, nor did Plaintiff receive any interest income until August 1973.

A. Interest Income

The general rule for the inclusion of an item of income is stated in Section 451(a) of the Internal Revenue Code of 1954 to be:

General Rule.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

If a taxpayer uses the accrual method of accounting, the inclusion of income is governed by Treasury Regulation § 1.446–1(c)(ii) which states in pertinent part:

Accrual Method. Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy.

·  ·  ·

It has been held for quite some time by the Courts that income need not be accrued when there is real doubt and uncertainty that the income will ever be received.[10]

The Tax Court stated the test another way in *Chicago & North Western Railway Co. v. Commissioner.*[11] In that case, the test was expressed as whether or not the taxpayer would receive the accrued income in a reasonable time. The idea being that the law contemplates that income accrued should reflect the real situation at hand.

This Court is of the opinion that when Sotan, Inc., defaulted in 1966, Plaintiff was put on notice that its interest payments would not very likely be forthcoming. Then when HEP-Richfield was formed and took over the asset of Sotan, Inc., the land, and its obligations, the chances of receiving any interest in a reasonable time were only speculative. HEP-Richfield was not a going concern in the usual sense. Its only business was to hold the 12,000 acres of land. It owed its very existence and its continuance to do business to Plaintiff's advances and payments on the Mercantile loan.

The situation in this case with HEP-Richfield cannot be compared to other situations

---

**10.** *The Cuba Railroad Company v. Commissioner*, 9 T.C. 211, 215 (1947).

**11.** 29 T.C. 989, 996 (1958).

in other cases such as *New York Water Service Corporation v. Commissioner.*[12]

The subsidiary corporation in *New York Water Service* carried on the business of supplying water to consumers in certain areas of Long Island, New York. This, of course, meant that it provided a service to customers who paid for that service which created a cash flow.

HEP-Richfield had one asset that produced no operating income so it had no cash flow from operations.

With respect to the expectancy of any payments from the subsidiary, these two situations are apples and oranges.

It can in no way be said that the situation had improved by June 30, 1970.

Mr. Henican's agreement to pay the $20,000 per month for 11 months did not alleviate the situation as it was to be used to pay down the Mercantile note. So even before he defaulted, there was no reason to believe that any of this money would ever be available for payment of interest.

The bankruptcy of Sotan, Inc., the threat of suit to recover the property by Sotan, Inc.'s trustee in bankruptcy and the resulting option only made the situation worse. The option price of only $7.6 million was less than the total of the original notes. Most assuredly, there was no reason to hope for payment of interest because of these events.

To sum up, it would have been speculative on Plaintiff's part to think that any interest payments would have been made during the fiscal years in question. Any payments of interest would have, to be realistic, had to come from the proceeds of the sale of the 12,000 acres. Because of the undeveloped nature of the land and its location, it is apparent why suitable buyers were not lined up to purchase the property. Indeed, the cloudy title probably would have prevented any such sale in the years in question.

**B. Worthless Debt Discharge**

The Internal Revenue Code of 1954 provides in 26 U.S.C. § 166(a) that:

General Rule.—

(1) Wholly Worthless Debts.—

There shall be allowed as a deduction any debt which becomes worthless within the taxable year. . . .

Among other regulations, the Secretary of the Treasury has promulgated Tr.Reg. § 1.166–2 which reads in (a), (b) and (c):

(a) General rule. In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor.

(b) Legal action not required. Where the surrounding circumstances indicate that a debt is to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166.

(c) Bankruptcy—(1) General rule. Bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt.

(2) Year of deduction. In bankruptcy cases a debt may become worthless before settlement in some instances; and in others, only when a settlement in bankruptcy has been reached. In either case, the mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, thereby confirming the conclusion that the debt is worthless, shall not authorize the shifting of the deduction under section 166 to such later year.

▇ Determining whether or not Plaintiff should have charged off the $750,000 profit note in the taxable year ending June 30, 1968, may be putting the cart before the horse. It could be questioned whether or not Plaintiff should have accrued this note in the first place. But the Parties have

**12.** 12 T.C. 780 (1949).

stipulated that the accrual was proper. So we must consider its writing off.

As no funds were advanced for the making of the note, it would seem logical that it would be last in priority to be paid off. Also its payoff depended on the successful development of the 12,000 acres. HEP-Richfield existed only as an entity in which title to the property was held and in whose name payments were made to Mercantile. It, of course, never had the resources to develop the 12,000 acres.

So development would have had to come from Sotan, Inc. or some other entity controlled by the developer who controlled Sotan, Inc., a Mr. Recile. But, the rest of Mr. Recile's empire was thrust into bankruptcy in 1967 when Sotan, Inc. was thrust into it. In January, 1968, the trustee in bankruptcy reported to that court that the situation was hopeless as far as any plans for reorganization of Mr. Recile's empire went.

At that time, any real hope for the development of the 12,000 acres went out the window. Plaintiff's only real hope would have been to sell the property while it continued to pay off the Mercantile indebtedness so that it would not be wiped out in any foreclosure proceeding by Mercantile.

Because there was no reason to hope that the property would be developed, Plaintiff was correct in determining that the $750,-000 profit note became worthless in the taxable year ending June 30, 1968.

### III.

### Amount Realized

Another subsidiary of Plaintiff, L&N Properties, Inc., sold the Lake North Apartments in Dallas, Texas, to two investors in 1967 in exchange for a note. As this subsidiary is wholly-owned, principal and interest payments were reported on Plaintiff's tax returns for the years in issue.

The note was in the sum of $312,184.14. But Plaintiff valued it at only 90% of its face amount on its 1967 income tax return.

The reason Plaintiff did this was that its subsidiary was only selling an equity position in the property at what it considered to be less than market terms.

The note had four deficiencies in the eyes of Plaintiff. First, it was secured by only a second lien. The purchasers were assuming the first lien and only buying L&N Properties, Inc.'s equity position. Second, the note carried no personal liability by its makers. Only the property was to be looked to for payment. Third, the interest note was below the market rate at that time. Fourth, the note provided for no down payment, interest payments only for two years, and larger but still relatively insignificant payments until June 30, 1975, when a balloon payment was due.

Plaintiff did present at trial the testimony of an expert witness to the effect that the note was speculative and not liquid so that its real value was far less than its face value. His conclusion was that an arms length purchaser would not spend over 50% of its face value for it.

The law applicable to this case is 26 U.S.C. § 1001(b) which, in pertinent part, states:

> Amount Realized.—The amount realized from the sale or other disposition of property shall be the sum of the money received plus the fair market value of the property (other than money received)
>
> . . .

Plaintiff's contention essentially is that it received other property that should be valued at its fair market value. If it were a cash basis taxpayer, that argument might hold water. But it is an accrual method taxpayer and the argument does not hold water.

An accrual method taxpayer must report income, as we have seen above, when the right to receive it is fixed and the amount to be received is reasonably certain.[13]

When the developers made the note, the obligation became fixed and the terms of the note fixed the amount to be received. This is not the case where events subse-

---

**13.** Treasury Regulation § 1.446–1(c)(ii), supra.

quent have called into question the viability of a note as in the situation of the 12,000 acres of Louisiana bayou land. This is the pure and simple situation in which a seller sold a piece of property for a promise to pay money in the future. The major attribute of the accrual method of accounting is that a future right to receive money is treated as if the money were received today.[14] That there is a possibility of default some time in the future is of no moment. In almost any conceivable situation, there exists some chance that future payments will not be received. Until events arise as those discussed in section II of this opinion, an accrual method taxpayer must report a promise to pay expressed in monetary terms as money received as of the date of accrual.

Therefore Defendant was correct in assessing deficiencies against Plaintiff in the applicable taxable years because of the 10% discount that Plaintiff used in reporting the $312,184.14 note.

The attorneys for the parties are requested to furnish the Court with a proposed judgment in accordance with the rulings contained in this opinion.

14. See the line of cases that includes *United States v. Wood*, 352 F.2d 522 (5th Cir. 1969), in this Circuit, *Key Homes, Inc. v. Commissioner*, 271 F.2d 280 (6th Cir. 1959), *First Savings &* *Loan Association v. Commissioner*, 40 T.C. 474 (1963), and the pertinent Supreme Court opinion, *Commissioner v. Hansen*, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959).