KATHERINE ANNE BERRYMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 82324, 83972. Filed October 17, 1961.

*Eugene J. Brenner, Esq.,* and *Harry L. Freeman, Esq.,* for the petitioner.

*Joseph D. Holmes, Jr., Esq.,* and *Edward H. Boyle, Esq.,* for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in income tax against the petitioner for years and in amounts as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 82324 | 1955 | $378.88 |
| 83972 | 1956 | 547.01 |
|  | 1957 | 142.98 |

The sole issue presented for decision is whether gain realized by petitioner in the taxable years, from her installment sale in 1954 of a 1-percent undivided interest in certain lands, qualifies in the circumstances of this case as capital gain from the sale of a capital asset; or whether such gain represents ordinary income from the sale of property held by petitioner primarily for sale to customers in the ordinary course of a trade or business, within the meaning of section 1221 (1) of the 1954 Code.

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by reference.

The petitioner, Katherine Anne Berryman, was during all the taxable years here involved, an unmarried woman named Katherine Anne Williams. On October 19, 1958, she was married to Robert P. Berryman. She filed an individual Federal income tax return for each of the years involved with the district director of internal revenue in San Francisco, California.

Petitioner attended the University of California for 2 years and graduated from San Jose State College in 1951, with a degree in interior decoration. She also attended a secretarial school for 5 months. In January 1952, she became employed by the G. W. Williams Company, a corporation in which her father had an interest, that engaged among other things in dealings in real estate. At first, petitioner worked in the insurance department of said company; but sometime in 1953 she transferred to a secretarial position in the company's home loan department, and she continued to be so employed there until May of 1958, when she terminated her employment. Such employments did not familiarize her with the selling of real estate. She has never held nor applied for any kind of real estate broker's license.

In 1942, while petitioner was a minor, her parents, George W. and Hortense Williams, as grantors, established an irrevocable trust for

her benefit, of which her father was the sole trustee. During the life of this trust which continued until December 1953, when petitioner was 25 years of age, it acquired stock in various corporations and also interests in several pieces of real estate, one of which is here involved. In May 1953, the trust assets included cash in an amount in excess of $10,000.

For some time prior to 1953, petitioner's father, George W. Williams, had been negotiating for the purchase of 1,159.6 acres of unimproved San Francisco peninsula land (hereinafter sometimes referred to. as San Bruno lands) owned by San Bruno Lands, Incorporated; but until 1953, he was unable to effect such purchase because of difficulty in obtaining sufficient financing. However, early in 1953, he interested a group of men, including himself, Frank Burrows, Andrew J. Conway, Martin Wunderlich, and Thomas J. Culligan, all of whom were prominent in the real estate business, in arranging for the purchase of said lands.

On April 23, 1953, the above-mentioned individuals, as agents for three unidentified groups designated as "Williams and Burrows," "Wunderlich," and "Conway and Culligan," entered into an agreement under which they agreed to undertake the purchase of all the outstanding shares of capital stock of San Bruno Lands, Incorporated, for a total consideration of approximately $1,437,500, in order to effect the basic purpose of acquiring the above-mentioned 1,159.6 acres of San Bruno lands owned by that corporation. The agreement further provided in material part, that for such purpose Williams and Burrows would contribute $233,333.33, Wunderlich would contribute $350,000, and Conway and Culligan would contribute $116,666.67; that the balance of the purchase price would be obtained through a suitable loan secured by hypothecating said property; that after said stock had been acquired, the corporation would immediately be dissolved, and the said real property would be distributed to the parties, as tenants in common, in undivided interests of one-third, one-half, and one-sixth, respectively; and that the costs and expenses of the transaction would be borne by the parties in proportion to their respective contributions. The understanding of said parties at the time they entered into this agreement was: That after the land had been acquired, the respective tenants in common would hold their undivided interests in the land for at least 6 months in order to permit realization of capital gain from disposition of the same; that such undivided interests would then be sold to a corporation to be formed by the principal contributors, for the purpose of having such corporation develop and subdivide the land; and that the capital stock of such new development corporation would be issued, one-third to Williams and Burrows, one-third to Conway and Culligan, and one-third to Wunderlich (which portions are different from the portions

in which contributions were to be made toward the acquisition of the lands).

Accordingly, on May 7, 1953, the capital stock of San Bruno Lands, Incorporated, was purchased in the names of Martin Wunderlich, Andrew J. Conway, and George W. Williams, after arrangements had been made for the contemplated bank loan; the corporation was then liquidated; and title to the San Bruno lands was taken in the names of said three individuals. Thereafter, on June 8, 1953, these three individuals executed quitclaim deeds to themselves and various other contributors as tenants in common; and they took back a power of attorney for the limited purpose of managing the property until it should thereafter be sold in accordance with the above-described plan.

Among the group represented by George W. Williams, which contributed capital for the acquisition of the San Bruno lands, was the above-mentioned irrevocable trust which Williams and his wife had created in 1942 for the benefit of their daughter Katherine, who is the petitioner in this case. As before stated, this trust had cash on hand in 1953 in an amount of more than $10,000; and Williams, acting as the trustee, contributed $7,000 of this amount on behalf of the trust toward the acquisition of said lands. Thereafter, in due course, the trust received, as a tenant in common, a conveyance of a 1-percent undivided interest in the San Bruno lands. And subsequently, in mid-December 1953 when petitioner was 25 years of age, the trust was dissolved as above stated; and all trust assets, including the 1-percent undivided interest in said lands, were transferred to petitioner individually, by quitclaim deed from the trustee.

Both before and after the time when the several tenants in common acquired their undivided interests in the San Bruno lands, portions of such lands were under lease to various flower growers, and also 142 acres of such lands were leased to the United States Navy. The rents so derived were deposited in a common bank account from which certain miscellaneous expenses (other than property taxes) were paid. Property taxes were paid directly by the tenants in common, in proportion to their respective interests. Periodic accountings were prepared for the tenants in common by one of the managing parties.

On October 28, 1953, George W. Williams, Burrows, Conway, Culligan, Wunderlich, and Boettcher & Company[1] organized Consolidated Lands, Incorporated, for the principal purpose of acquiring, subdividing, and developing the San Bruno lands, in conformity with the above-mentioned original plan. Neither the petitioner nor the above-mentioned trust for her benefit was at any time an incorporator,

---

[1] Boettcher & Company does not appear to have been a contributor toward the purchase of the stock of San Bruno Lands, Incorporated.

shareholder, director, officer, or employee of this new development corporation.

On February 10, 1954, all the tenants in common who held undivided interests in the San Bruno lands, sold and conveyed an 884.2-acre tract out of said lands to the above-mentioned new development corporation, for a total sales price of $1,768,500. This price was represented by a cash downpayment of $100,000, and an installment note for the balance which was payable in installments of $100,000 per year with interest at 4 percent per annum. Petitioner was one of the tenants in common who joined in this sale to the new development corporation. She received $1,000 cash at the time of the conveyance in 1954, and also a 1-percent interest in the installment note for the balance.

This was the first sale of any interest in real property made by petitioner. In the year 1956, another 53-acre parcel of the San Bruno lands was taken by the United States Navy through condemnation proceedings; and in the same year, still another 80-acre parcel of said lands was jointly conveyed by the several tenants in common to the above-mentioned development corporation, for use as the site for a shopping center. Respondent has made no claim herein that gains derived by petitioner from these two latter conveyances were other than long-term capital gains.

During the time that the tenants in common held their interests in the San Bruno lands, no improvements were made thereon, and no subdivision of the same was effected.

Petitioner, in her income tax returns for 1954 (the year of sale) and for 1955, 1956, and 1957 (the years here involved) reported her receipts from the above-mentioned installment sale, and treated the gain therefrom as long-term capital gain. Respondent, in his deficiency notices for the taxable years 1955, 1956, and 1957, determined that petitioner's "gains realized on collections on the installment contract" represented ordinary income from the sale of property held by the petitioner primarily for sale to customers in the ordinary course of a trade or business.

### ULTIMATE FINDING.

Petitioner did not hold her 1-percent undivided interest in the 884.2 acres of land here involved primarily for sale to customers in the ordinary course of a trade or business.

### OPINION.

The basic question for decision in this case is: Whether petitioner's 1-percent undivided interest in approximately 885 acres of land which she and other tenants in common sold to the Consolidated Lands com-

pany in 1954, is excludible from classification as a "capital asset" within the meaning of section 1221 of the 1954 Code.[2] Respondent contends that said interest is so excludible, on the ground that it constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of * * * [her] trade or business." If such property interest was not held by her primarily for sale to customers in the ordinary course of a trade or business, then the gain which she derived therefrom was properly reported by her as capital gain; but if, on the other hand, the same was held by her for such purpose, then her gain is taxable as ordinary income, as determined by the respondent. As was stated by the Court of Appeals for the Ninth Circuit in *Stockton Harbor Industrial Co.* v. *Commissioner*, 216 F. 2d 638, 650, affirming a Memorandum Opinion of this Court: "What is and what is not trade or business and when property is or is not held for sale to customers are questions of fact."

The identical issue here presented, based on substantially the same facts in a case involving the petitioner's sister, was recently decided by the United States District Court for the Northern District of California, in *Rosebrook* v. *United States*, 191 F. Supp. 356 (1961). In that case the court, in an extended and well-considered opinion, found the facts substantially in accord with the findings of fact which we have hereinabove made; and it then decided the issue in favor of the taxpayer. We agree with the court's decision in that case.

In our view, the situation here presented was in substance this. In 1953, petitioner's father and several other persons who were prominent in the real estate field, entered into an arrangement among themselves, whereby they made plans to acquire all the capital stock of the San Bruno corporation which held a valuable tract of San Francisco peninsula land that was suitable for subdivision purposes; to finance such purchase through substantial contributions of cash and also through a bank loan; to thereupon dissolve the San Bruno corporation and distribute the land to themselves and others in undivided portions, as tenants in common; and subsequently after a period of more than 6 months, to arrange for all such tenants in common to sell their undivided interests in part of said land to a new corporation, which was to be formed by petitioner's father and his said associates for the specific purpose of having this new corporation develop, subdivide, and dispose of such land. Petitioner's father, in arranging for the amounts of cash which he was responsible for contributing toward the

---

[2] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

purchase price of the stock of the San Bruno corporation, caused a trust which he and his wife had created for the benefit of petitioner about 10 years previously, to pay in the amount of $7,000 cash and thereby acquire a 1-percent undivided interest in the land which was the subject matter of the overall plan.

Neither the trust, nor the present petitioner as the subsequent distributee and holder of the trust assets, had any part in the formation of the proposed new development corporation which was to acquire, subdivide, and ultimately dispose of the land; nor was either said trust or the petitioner at any time a stockholder, director, officer, or employee of the new development corporation. Respondent has conceded on brief that: Petitioner did not participate in the framing of the original plans for the acquisition, handling, and sale of the land obtained from the San Bruno corporation; she was not consulted by her father about the contribution of the cash held by the trust established for her, towards the purchase of the stock of said corporation; she was not aware of the plans which her father and the other principals had for the land acquired from that corporation; she did not participate in the decision to liquidate said corporation, or in the decision to distribute the land to the individual members of the group as tenants in common; and she was not familiar with the deed used by her father, as trustee, to distribute the 1-percent undivided interest held by the trust to her. What the trust and petitioner actually did, was merely to invest $7,000 in a 1-percent undivided interest in certain land; and then later, sell most of the land covered by such undivided interest, without any improvement of the land, to the new development corporation after it had been organized by petitioner's father and his associates.

It is our conclusion after considering all of the evidence and after having heard and weighed the testimony of all the witnesses—and we have hereinabove found as an ultimate fact—that petitioner did not, at any time, hold her 1-percent undivided interest in the San Bruno lands primarily for sale to customers in the ordinary course of a trade or business; and we further conclude, that she may not properly be regarded, by imputation or otherwise, to have been a member of any business organization which was, during the period when she owned her 1-percent undivided interest, holding the land for sale to customers in the ordinary course of a trade or business. Thus it follows, and we here hold, that the petitioner's gain here involved is long-term capital gain from the sale of a capital asset. These conclusions and this holding are in accord with those of the District Court in the above-mentioned case.

We decide the present issue for the petitioner.

*Decisions will be entered for the petitioner.*