Alys Wunderlich **BACHLER**, individually, Successor to Joseph A. Maun, Successor Trustee of the Martin Wunderlich Trust for Alys Wunderlich, Plaintiff,

v.

The **UNITED STATES** of America, Defendant (and other cases).

Civ. Nos. 3-60-77-80 and 3-63-270-273.

United States District Court
D. Minnesota,
Third Division.
April 29, 1964.

Lawrence J. Hayes and James W. Brehl, St. Paul, Minn., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, David A. Wilson, Jr., and Moshe Schuldinger, Attys., Dept. of Justice, Washington, D. C., and Miles W. Lord, U. S. Atty., Minneapolis, Minn., for defendant.

LARSON, District Judge.

The Court has considered the testimony adduced at the hearing on January 21, 1964, and the briefs and arguments of counsel.

The Court has concluded that plaintiffs are entitled to recover. The parties will agree on the amount of the refunds and will submit a proposed Judgment to the Court.

These actions involve eight suits for refund of income taxes brought by four trusts for taxes paid in 1955, 1956 and 1957. The trusts were terminated in December of 1962. The suits have been consolidated for trial, and the issues involved in each are identical. In May of 1953 each of the trusts purchased an interest in 1,159 acres of undeveloped real estate and these interests were sold in February, 1954, with each trust reporting the income from such sale in 1955, 1956 and 1957 on the installment basis as gain from the sale of a capital asset. The Commissioner assessed a deficiency based on his determination that the gains realized by the trusts should be taxed as ordinary income. The taxpayers paid the additional tax and filed timely claims for refund. The claims were denied by the Commissioner and these suits were brought.

The question facing this Court is whether the installment sale of an interest in land in 1954 resulted in capital gain under sections 1202, 1221 and 1222 of the Internal Revenue Code of 1954 or whether it was a sale in the ordinary course of business giving rise to ordinary income.

The circumstances forming the background of these lawsuits will be briefly related.

In 1953 five men—George W. Williams, Frank Burrows, Andrew J. Conway, Thomas J. Culligan and Martin Wunderlich—agreed to undertake the purchase of the stock of San Bruno Lands, Inc. The assets of San Bruno Lands, Inc., were a 1,159 acre parcel of undeveloped land located on the peninsula south of San Francisco, which will sometimes be referred to herein as the San Bruno Lands. The purchase price was to be about $1,437,500, to be contributed by three groups represented by Conway and Culligan, Williams and Burrows, and Wunderlich, with the balance obtained through loans. Among the contributing interests represented by Williams were irrevocable trusts established for Williams' daughters. See Katherine Anne Berryman, 37 T.C. 45 (1961). In the same manner the trusts established by Martin Wunderlich in 1940, of which the instant plaintiffs were the beneficiaries, were among the contributing interests for the Wunderlich group.

The transactions with respect to the Wunderlich trusts were initiated in April, 1953, by a phone call from Martin Wunderlich to Gerhard Bundlie, then trustee of the Wunderlich trusts, suggesting that the trusts acquire an interest in land south of San Francisco. On previous occasions Wunderlich had suggested investments for the trusts which Bundlie, an experienced lawyer who was knowledgeable about real estate and investments generally, had decided not to make. On this occasion Bundlie flew to California to examine the property. Deciding that it would be a good investment for the trusts (which had never before owned real estate and owned none subsequently), Bundlie, on May 7, 1953, purchased a 6¼% interest in San Bruno Lands, Inc., for each of the four trusts. The purchase agreement provided that George W. Williams, Andrew Conway and Martin Wunderlich would execute the purchase of the stock [*] and that San Bruno Lands, Inc., would be dissolved followed by the conveyance of its assets to the purchasing parties as tenants in common. This was in accordance with an April 23, 1953, agreement (Plaintiff's Ex. 16) among Williams, Burrows, Wunderlich, Conway and Culligan, which was incorporated by reference into the May 7 agreement.

Events proceeded as planned. The group purchased the stock, made the necessary financing arrangements, dissolved San Bruno Lands, Inc., and distributed its assets among the purchasing interests according to the predetermined allocation as tenants in common.

No improvements were made on the property and on February 10, 1954, 884 acres of the 1,159 acres of land purchased in May, 1953, were sold to Consolidated Lands, Inc. The total sales price of the 884 acres was $1,768,500, which represented a profit of about $1,108,000 on the transaction. It is the tax treatment of the trusts' share of the payment for this land which is in dispute. Consolidated Lands, Inc., was apparently formed by Martin Wunderlich, Thomas Culligan, George Williams, Frank Burrows and Andrew Conway, along with parties who previously had no connection with the San Bruno Lands. The Government contends that the course the transactions followed was laid out in a document executed on April 23, 1953, by Wunderlich, Culligan, Williams, Burrows and Conway. (Government Exhibit A). This document, according to the Government, shows that a joint venture was formed to purchase the stock of San Bruno Lands, Inc., to liquidate the corporation and distribute all of its real property to the participants as tenants-in-common, to have the property held by the participants for six months after which time it would be sold at a predetermined price to a land development corporation to be formed by the participants, and to have the land development company subdivide and sell the property in the ordinary course of business. The crux of the Government

---

[*] Mr. Bundlie was informed that three persons, rather than all purchasers, were named as purchasers of the stock on request of the sellers because of certain unspecified provisions of the California Blue Sky Laws.

position is that the trusts received ordinary income from the sale of the land because they participated, through Trustee Bundlie, in this joint venture. Yet there is no evidence that Bundlie was familiar with Government Exhibit A or the course of conduct envisaged by it. Indeed, Bundlie specifically denied having seen Government Exhibit A. The evidence shows that at the time he purchased an interest in San Bruno Lands, Inc., Bundlie was familiar only with a plan to purchase and dissolve San Bruno Lands, Inc., and we find that there is no evidence that Martin Wunderlich at any time during this transaction acted as an agent for trustee Gerhard C. Bundlie.

The theory of the Government's case is that since the tax law applicable to partnerships is applicable to joint ventures also, Int.Rev.Code of 1939, § 3797 (a) (2); Int.Rev.Code of 1954, § 761(a), the income received by the trusts should be taxed as ordinary income under either of two approaches.

■■ A partner or a joint venturer is taxed on his distributive share of the partnership or joint venture income, Int. Rev.Code of 1939, § 181; Int.Rev.Code of 1954, §§ 701, 702. The character of any item of income is determined by its character in the hands of the entity. Thus *if* the trusts were participants in a joint venture which was formed for the business of developing and subdividing property and selling it in the ordinary course of business, then the sale of joint venture property would normally give rise to ordinary income. The Government's alternative theory is that the trusts received the distributions in exchange for their interests in the joint venture, and under the "collapsible partnership" provisions of the Code, (Int.Rev. Code of 1954, § 751) this would produce ordinary income. There is no need to detail the Government's use of § 751; suffice it to say that the land sold is viewed as an inventory item of the joint venture brought under § 751(a) (2) through the application of Treas.Reg. § 1.751–1 (d).

■ The assumption of a joint venture is common to both Government approaches, and it is the absence of a joint venture to which the instant taxpayers belonged which is fatal to the Government position. Whether or not a joint venture existed as to some of those who invested in San Bruno Lands, Inc., need not be determined here, for we find that even if there was such a joint venture, compare Fishback v. United States, 215 F.Supp. 621 (S.D.So.Dak.1963); Tate v. Knox, 131 F.Supp. 514 (D.Minn.1955), the trusts were not participants. The trusts purchased an interest in land for trust investment purposes, held it for the requisite period of time and then sold it. They are entitled to capital gains treatment as to income received from the transaction.

A like result has been reached by three other courts which have considered the same set of facts. Katherine Anne Berryman, 37 T.C. 45 (1961) involved a trust established by George W. Williams for his daughter. The trust invested in San Bruno Lands, Inc., and eventually received a one per cent interest in the San Bruno Lands as a tenant in common in the same manner as each of the Wunderlich trusts received a 6.25 per cent interest. The Government attempted to tax the proceeds of the February 10, 1954, sale at ordinary income rates making essentially the same argument as it makes in the instant case. The Tax Court held that the taxpayer there did not hold her interest primarily for sale to customers in the ordinary course of business, and that the taxpayer "may not properly be regarded, by imputation or otherwise, to have been a member of any business organization which was, during the period when she owned her 1-percent undivided interest, holding the land for sale to customers in the ordinary course of a trade or business." (37 T.C. at 51). The same result was reached in Rosebrook v. United States, 191 F.Supp. 356 (N.D.Calif.1960) which involved another trust established by George C. Williams for one of his children. The Court said in Rosebrook

with reference to the Government argument that the trust was a participant in a joint venture:

"Even if her father, as her trustee, invested her trust funds in the land because he knew that it was worth more than it cost, and that a large part of it would eventually be sold at a profit to a development company in the course of his business activities, this would be, as far as plaintiff's interest was concerned, nothing more than an investment in a capital asset with a view to eventual sale at a profit. Indeed, it would have been nothing more than an investment for all members of the venture if that were all there was to it. The situation of others in the venture is differentiated from plaintiff's situation by the fact that they held their interests with a view to eventual disposition through the medium of a development corporation to customers in the ordinary course of their business. The evidence, however, shows that plaintiff was not in any such situation.

\* \* \* \* \* \*

"The intent and purpose of participants in a joint venture, which contemplates a sale of their respective realty interests to an ultimate purchaser, as in this case the development company, might be quite different one from another. For some it may be just a step in carrying on their business; for others it may be merely a single opportune investment with a view of ultimate profit but unrelated to any business of the participant, as in the case of plaintiff here. In the absence of a true business partnership for the purpose of the transaction, which the Court finds did not exist here, the intent and purposes of the former category are not imputed to the latter category, nor does the situation of the former for tax purposes necessarily determine the situation of the latter." (191 F.Supp. at 358–59).

The Rosebrook decision was affirmed in United States v. Rosebrook, 318 F.2d 316, 319 (9th Cir. 1963). We are in substantial agreement with the Berryman and two Rosebrook decisions.

The Government argues here that the Berryman and Rosebrook decisions were incorrect because the "trusts were at all times fully bound and obligated participants in the joint venture." This apparently refers to George C. Williams, who was a participant in the April 23, 1953, meetings, being the trustee and binding the trusts to whatever plan was developed there. That argument was not accepted by the courts to which it was presented, and it is even less persuasive here, for no representative of the Wunderlich trusts was involved in the April 23 negotiations. Gerhard Bundlie was an independent trustee, and, as pointed out above, Martin C. Wunderlich was at no time an agent of the trusts.

The Government claims that its position in Rosebrook and Berryman was not that the intent of joint venturers holding property should be imputed to the trusts. Rather "what determines how the gain is to be taxed is the answer to the following question: Was the property owned by the joint venture, as an entity in itself, held for sale to customers in the ordinary course of business?" But this very question assumes a joint venture and, as we have said, there is no evidence of intent on the part of the trusts, acting through Gerhard Bundlie, to participate in a joint venture. That being the case, it is not necessary to reach the imputation point. However, it might be helpful to indicate that even if there was a joint venture among some of the tenants in common (of which there is no evidence), as the Ninth Circuit has pointed out in the identical fact situation:

"We do not believe that the making of an investment by a trustee in a joint venture irrevocably imputes to the beneficiary of the trust the intentions of the managers of the venture regardless of when the trust property is removed from the ven-

ture." (United States v. Rosebrook, supra, 318 F.2d at 319).

The foregoing will constitute Findings of Fact and Conclusions of Law within Rule 52 of the Rules of Civil Procedure.