Jacob L. Van Drunen and Grace L. Van Drunen v. Commissioner.
Van Drunen v. Commissioner
Docket No. 993-62.
United States Tax Court
T.C. Memo 1964-151; 1964 Tax Ct. Memo LEXIS 186; 23 T.C.M. (CCH) 903; T.C.M. (RIA) 64151; June 1, 1964
*186 Thomas J. Donnelly, Jr., 756 N. Milwaukee St., Milwaukee, Wis., for the petitioners. Joseph T. de Nicola, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in the income tax of petitioners for the year 1959 in the amount of $14,307.53. The only issue for decision is whether petitioner Jacob L. Van Drunen, a physician, realized ordinary income or long-term capital gain from the sale of certain lots during the taxable year 1959. Findings of Fact Some of the facts were stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein and made a part of our findings. Jacob L. Van Drunen and Grace L. Van Drunen are husband and wife, residing at 3253 Ridge Road, Lansing, Illinois. They filed their joint Federal income tax return for the year 1959 with the district director of internal revenue at Chicago, Illinois. Jacob L. Van Drunen (hereinafter called petitioner) has been a licensed physician and surgeon in the State of Illinois since 1936. Clarence L. Baldwin (hereinafter referred to as Baldwin) is a real estate broker and builder. He is president of *187 Baldwin Realty Co., Inc., Highland, Indiana, a corporation which presently has 10 to 12 stockholders and which was engaged in the general real estate brokerage, building, subdividing, and development of property. The petitioner is not a stockholder in Baldwin Realty Co., Inc. Baldwin and the petitioner first became acquainted in 1940 when Baldwin went to the petitioner for medical care. Petitioner knew at that time that Baldwin was active in real estate. Several years later the petitioner contacted Baldwin about the purchase of investments in real estate. Through Baldwin he purchased mortgages and real estate contracts at discounts. These investments were made under such circumstances as would require Baldwin Realty Co., Inc., to make all the collections and to remit the collections to petitioner. In 1952 Baldwin interested petitioner in the purchase of a 35 acre piece of real estate known as the Columbia Avenue property. Baldwin thought that the acreage was a good buy, but was unable to handle the transaction financially. Consequently, he asked petitioner if he wished to join him in the purchase. The property was purchased for $13,942.65 and was sold in 1954 for $34,962. Petitioner *188 and Baldwin did nothing to improve the property during the time they held it. The property was strictly held as an investment for future sale. Also in 1952 Baldwin interested petitioner in the purchase of 69 acres of unimproved land in Munster, Indiana. On April 22, 1952, petitioner and Baldwin paid $5,000 for an option to purchase the unimproved real estate located in Munster (hereinafter referred to as the Munster property). The total purchase price called for by the option was $50,000 with the price paid for the option to be applied on the purchase price. The option was exercised. Baldwin believed the land was in a good location and that it would appreciate in value within a comparatively short period of time. On August 18, 1952, the petitioner and Baldwin entered into an agreement concerning the Munster property wherein they agreed that in the event of the death of either of them, the survivor would purchase the one-half interest of the deceased in the Munster property at the original purchase price, or such equity as the deceased might have at that time. The petitioner and Baldwin had an understanding at the time of the purchase of the Munster property that it would be held *189 as an investment in the same manner as the Columbia Avenue property. They did not intend to subdivide it or develop it in any way, but rather to hold it for price appreciation and ultimate sale when an acceptable price could be obtained. Baldwin had had some experience in the subdividing and development of land, but he had no thought at that time of subdividing or developing the Munster property. About a year after the purchase of the Munster property, Baldwin, who claimed he had a need for capital to use in a building development, asked the petitioner whether he would be interested in selling the Munster property. The petitioner refused, stating that he was not then ready to sell. On several other occasions Baldwin attempted to impress upon the petitioner his need for capital and finally the petitioner approved the effort to find a buyer. Baldwin attempted to sell the property as acreage for $100,000. He advertised in the newspapers circulated in the area at least 150 times. The petitioner made no personal efforts to sell the property. Baldwin also contacted brokers, builders, developers, and investors known in the area and discussed the Munster property with them. Although Baldwin *190 worked on the sale for some 8 months, he was unable to find a purchaser. He then notified the petitioner that he had not been able to make a sale. Sometime later Baldwin approached petitioner with the idea of subdividing the Munster property into lots and improving it as a method of liquidating their investment. Although Baldwin attempted to impress upon petitioner his personal need to realize on his investment, the petitioner refused to go along with the idea, stating that he was not interested in getting into the development and subdividing of real estate. Petitioner had personal reasons for not wanting to get into such a project, the principal one being that he was then devoting about 70 hours per week to his medical practice and had no time for other activities. Nevertheless, Baldwin was persistent and petitioner finally agreed to go along with the plan as a personal favor to Baldwin. They orally agreed that Baldwin would do all the work necessary in connection with the subdivision, for which he would be paid the usual broker's commission (10 percent) on the sale of the lots. The parties also agreed to split the costs thereof and the proceeds from the sale of the lots. In addition, *191 it was agreed that the petitioner would not be required to engage in any activities with respect to the Munster property. Baldwin even made arrangements with a local bank so that it would not be necessary for petitioner to execute deeds. On March 14, 1955, a plat of subdivision of 23 of the 69 acres of the Munster property was filed with the Recorder of Lake County, Indiana. The name given to the subdivision was Whiteoak Manor First Addition. On June 19, 1958, a plat of subdivision of 12 acres of the Munster property was filed with the Recorder of Lake County, Indiana. This subdivision was called Whiteoak Manor Second Addition. In the aggregate, these plats subdivided approximately 35 of the 69 acres of the Munster property. The improvements that were made on the Munster property consisted of streets, street signs, sidewalks, curbs, and storm sewers. Individual lots were landscaped. The parkway was also landscaped to beautify the entrance to the subdivision. All of the development work was done by Baldwin or under his general supervision. Petitioner was never contacted about layouts, expenditures, pricing, advertising, sales or any other matters. Petitioner never furnished *192 Baldwin with any leads to sales. And his name was never associated nor connected in any way with the subdivision. Baldwin sent statements periodically to petitioner for amounts which petitioner owed him for the cost of development. The petitioner paid these statements by checks. The following schedule shows the number of lot sales, sales prices, cost, expenses of the sale, and net proceeds of the Munster property: No. of
Proceeds
Cost or
Expense
Lots
of
other
of
Net
Year
Sold
Sales
Basis
Sales
Proceeds
1955
6
$ 11,000.00
$ 4,500.00
$ 6,500.00
1956
16
31,940.00
20,913.06
11,026.94
1957
20
38,497.15
27,472.50
$ 9,635.24
1,389.41
1958
15
37,861.51
14,922.42
4,449.38
18,489.71
1959
21
56,223.92
8,599.02
5,894.07
41,730.83
1960
13
46,522.88
8,438.78
5,809.32
32,274.78
1961
2
8,804.80
1,259.46
689.57
6,855.77
$230,850.26
$86,105.24
$26,477.58
$118,267.44
All advertising was done in the name of Baldwin Realty Co., Inc. The petitioner's name never appeared. Baldwin notified other realtors that these lots were for sale and he split his commission with the other realtors if they secured a *193 buyer. The Federal income tax returns of the petitioners for the years 1955 through 1961 were prepared by a firm of certified public accountants. The petitioner supplied the details surrounding the acquisition and development of the Munster property to the accounting firm. The net proceeds of the sale of lots for the years 1955 through 1958 were reported as ordinary income by petitioners on their Federal income tax returns for those years. The Federal income tax returns of petitioners for the years 1955 through 1958 show the following: Portion
of Taxable
Income
Attributable
Amount of
Taxable
to Sale of
Tax Reported
Year
Income
Munster Lots
on Return
1955
$30,859.35
$ 6,500.00
$ 9,863.89
1956
31,726.62
11,026.94
10,271.51
1957
38,025.37
1,389.41
13,473.45
1958
51,096.70
18,489.71
20,947.05
Petitioners reported the following adjusted gross income on their income tax returns for the years 1955 through 1959: Net
Proceeds from
Dividend
Adjusted
Medical
Income
Gross
Practice
(after $100
Interest
Capital Gains
Year
Income
Schedule C
Exclusion)
Income
or Losses
1955
$36,076.66
$21,573.60
$5,957.00
$1,574.56
[1] ($ 1,000.00)
1956
35,129.12
11,879.37
6,896.77
5,232.93
[1] ( 967.17)
1957
42,355.95
28,561.62
8,099.56
3,842.03
[1] ( 623.42)
1958
56,080.01
27,332.11
8,165.21
2,183.01
[1] ( 1,000.00)
1959
62,350.77
25,270.88
8,818.98
1,876.18
[3] 25,512.86
*194 Gains on
Sale of
Rental
Year
Munster Lots
Income
Wages
Misc.
1955
[2] $ 6,500.00
$1,471.50
$300.00
1956
[2] 11,026.94
670.22
$390.06
1957
[2] 1,389.41
1,086.75
1958
[2] 18,489.71
909.97
1959
[4] 41,730.83
571.87
On April 22, 1959, the petitioner purchased Baldwin's interest in the remaining 34 acres of the Munster property for $49,500. Prior to that time Baldwin had received an offer of approximately $3,000 an acre for the 34 acres, but the petitioner thought the land was worth more. He refused the offer and ultimately bought Baldwin's interest for approximately the amount Baldwin had been offered. Since petitioner graduated from medical school he has never engaged in any business except the practice of medicine. Except for the Munster property he has never been associated or connected in any way with any individual or company which has engaged in the subdivision of real estate. Besides the Columbia Avenue property and the Munster *195 property, the petitioner has only owned the following properties: (1) a piece of land inherited from his father, consisting of about 10 acres and some contiguous land acquired from relatives; (2) his home and office, which are in one building; and (3) a small frame building next to the home and office. During the time the Munster property was being subdivided and sold by Baldwin, petitioner was interested in it purely as an investment. His only connection with it was the money he had invested. Ultimate Finding During the year 1959 the petitioner held his interest in the Munster property primarily as an investment and not primarily for sale to customers in the ordinary course of his business. Opinion The problem here is whether the amounts received by the petitioner during the year 1959 from the sale of certain lots should be taxed as ordinary income, as determined by respondent, or long-term capital gain, as contended by petitioner. Its resolution depends on whether the Munster property was held by the petitioner "primarily for sale to customers in the ordinary course of his trade or business," so as to be excluded from the definition of a capital asset under section 1221(1), Internal Revenue Code *196 of 1954. This is essentially a factual question. D. L. Phillips, 24 T.C. 435 (1955). The same issue under varying factual situations has been litigated numerous times and the courts have repeatedly emphasized that each case must be decided on its own facts. The total factual pattern controls rather than any isolated or specific facts. See Mauldin v. Commissioner, 195 F. 2d 714 (C.A. 10, 1952), affirming 16 T.C. 698 (1951). Some of the factors to be considered are: (1) the frequency and continuity of the transactions claimed to result in a trade or business; (2) the reason, purpose, and intent for which the property was acquired and held; (3) the activity of the taxpayer, or his agent, in connection with real estate sales; (4) the nature and extent of the taxpayer's business or vocation; (5) the extent of improvements made to the property sold; (6) whether the property was held primarily for investment; (7) whether the taxpayer devoted appreciable time, attention, and efforts to additional "business" with substantial regularity tantamount to an occupational undertaking; and (8) the character and degree of supervision or control exercised by *197 taxpayer over any representative employed or used to carry on taxpayer's activities. Certainly there has been no unanimity of opinion by the courts on this frequently litigated question. Indeed, there is an exceedingly thin line between the cases cited by both parties in this proceeding. Petitioner relies principally upon Estate of William D. Mundy, 36 T.C. 703 (1961); Rosebrook v. United States, 191 F. Supp. 356 (N.D. Cal.), affd. 318 F. 2d 316 (C.A. 9, 1963); Katherine Ann Berryman, 37 T.C. 45 (1962); Chandler v. United States, 226 F. 2d 403 (C.A. 7, 1955); Fahs v. Crawford, 161 F. 2d 315 (C.A. 5, 1947); Delsing v. United States, 186 F. 2d 59 (C.A. 5, 1951); and Voss v. United States, 329 F. 2d 164 (C.A. 7, 1964). Respondent contends that the instant case is controlled by Raymond Bauschard, 31 T.C. 910 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960); John D. Riley, 37 T.C. 932 (1962); and Estate of Peter Finder, 37 T.C. 411 (1961). While not entirely free from doubt, this case is, in our judgment, on the same side of the line as *198 the cases cited by the petitioner, and not on the other side occupied by respondent's authorities. Since the answer must be determined from all the facts and circumstances here involved, we think it would serve no useful purpose to embark upon a detailed discussion and analysis of the many cases cited. We have considered all the evidence before us in the light of the various criteria regarded as pertinent in the foregoing cases and have concluded that the petitioner held his interest in the Munster property as an investment and not primarily for sale to customers in the ordinary course of his business. We will comment briefly on the factors mentioned above. As to the frequency and continuity of transactions claimed to result in a business, it is true that 93 lots in 35 acres of the Munster property were sold over the 6 year period from 1955 through 1961. However, in the Chandler case, supra, the Court of Appeals for the Seventh Circuit recognized that, even though a large number of parcels of land may be sold and the expenses incurred may be substantial, these factors alone are not sufficient to put the taxpayer-seller into the ordinary course of a real estate business if they *199 are incidental and appropriate to his primary purpose of liquidating a capital asset. See also Fahs v. Crawford, supra; and Smith v. Dunn, 224 F. 2d 353 (C.A. 5, 1955). The facts here indicate that the petitioner's intent, both at the time he purchased an interest in the Munster property and also during the entire period of its development and sale, was for investment purposes. No fact of record or act performed by petitioner reflects unfavorably on his clear and unimpeached testimony. We are satisfied that his intent in yielding to Balwin's request to subdivide and sell the land was purely the liquidation of his investment. The main thrust of respondent's position in this case is that all of Baldwin's activities from the initial plans of development to the consummation of sale of lots are attributable to petitioner. Respondent argues that there was a partnership agreement between the petitioner and Baldwin, which at the very least should be considered a joint venture. In the alternative it is asserted that Baldwin acted as petitioner's agent in subdividing the acreage and selling the lots. There was no partnership agreement either written or oral, and *200 therefore no true business partnership existed. Whether or not a joint venture relationship in fact existed depends essentially upon the intention of the parties. Donald P. Oak, 46 B.T.A. 265, 271 (1942). We think no inference can be drawn from this record that either Baldwin or the petitioner intended a joint venture. The permission given to Baldwin to engage in the subdivision activities was for the purpose of resolving a dispute as to when and how their investment would be liquidated without the necessity of partition, which was impractical, or the necessity of one purchasing the interest of the other, which did not suit the financial convenience of either of them. In Rosebrook v. United States, supra, the District Court said: The intent and purpose of participants in a joint venture, which contemplates a sale of their respective realty interests to an ultimate purchaser, as in this case the development company, might be quite different one from another. For some it may be just a step in carrying on their business; for others it may be merely a single opportune investment with a view of ultimate profit but unrelated to any business of the participant, *201 as in the case of plaintiff here. Moreover, there was no joining of skills in a common undertaking. Nor was there any joint control over the activities of subdividing and selling. Efforts to improve, subdivide and sell the Munster property were solely the activities of Baldwin. Baldwin never consulted with petitioner about plans, lay-out, pricing, sales, advertising, or anything else. The petitioner did not devote his time, attention or efforts to the Munster property. And, of course, he exercised no supervision or control over any person employed or used to carry on the subdivision activities. Consequently, on these facts we cannot find a joint venture or an agency relationship. Still another significant factor is that the petitioner was actively engaged, as he has been since 1936, in the practice of medicine and surgery. In fact, his own testimony establishes that during the time the Munster property was being developed he spent nearly 70 hours per week in his practice. He had no time for the real estate business and personally engaged in no activity whatsoever which would indicate that he was involved in such a business. The active pursuit of his practice of medicine, coupled *202 with the complete absence of "busyness" on his part in connection with the development and sale of the lots in the Munster property, indicate the liquidation of a capital asset by a man who, at most, had attempted to put his savings to work by investment in real property while following his profession in a normal way. Our opinion in Estate of William D. Mundy, supra, points us down the path to this result. In that case we stated (at p. 711): the courts have also recognized that a taxpayer does not necessarily place himself in the real estate business by subdividing property he has inherited or held as an investment and selling it by lots in order to obtain a better price than it would attract if sold as one unimproved tract. Smith v. Dunn, 224 F. 2d 353 (C.A. 5, 1955); Camp v. Murray, 226 F. 2d 931 (C.A. 4, 1955); Wellesley A. Ayling, 32 T.C. 704 (1959); Allen Moore, 30 T.C. 1306 (1958); W. T. Thrift, Sr., 15 T.C. 366 (1950). See also the recent decision in Voss v. United States, supra, where the taxpayer, a dentist, turned over investment property which he had held for several years to *203 a realtor to sell for him. The realtor attempted to sell it as acreage but was unable to do so. He then advised the taxpayer that he should develop and subdivide the property. The taxpayer agreed and permitted the realtor to handle its development and sale. The taxpayer did not actively participate therein. Under these circumstances the Court of Appeals for the Seventh Circuit held that the District Court erred in failing to direct a verdict for the taxpayer, citing with approval our opinion in the Mundy case. Accordingly, we hold that the respondent erred. Decision will be entered for the petitioners. Footnotes
1. From sale of shares of stock. ↩
3. This figure includes gains from sale of Munster lots at 50 percent. ↩
2. Ordinary income. ↩
4. Reported on return as capital gains and included in prior column.↩