George I. Bauman and Esther E. Bauman, et al. [1] v. Commissioner. Bauman v. Commissioner
Docket Nos. 90036-40, 90051.
United States Tax Court
T.C. Memo 1964-179; 1964 Tax Ct. Memo LEXIS 155; 23 T.C.M. (CCH) 1064; T.C.M. (RIA) 64179; June 30, 1964
*155 Real property and mortgages on real property were held for sale by the petitioners or their joint ventures in the ordinary course of their trades or businesses. George R. Sheriff, 42 Broadway, N. Y., N. Y., for the petitioners. Edward H. Hance for the respondent. TRAIN
[Memorandum Findings of Fact and Opinion] TRAIN, Judge: Respondent determined deficiencies in income taxes as follows: 1954
1955
George I. Bauman and Esther
E. Bauman
$318.66
$2,417.75
Docket No. 90036
Julius Schnapper and Lillian
Schnapper
317.07
1,590.30
Docket No. 90037
Benjamin Mallamud and
Evelyn Mallamud
569.42
4,034.38
Docket No. 90038
John J. Vogrin and Madeline
Vogrin
1,162.94
Docket No. 90039
Willard S. Gourse
1,398.64
Docket No. 90040
Arthur E. Buchwald
363.48
2,030.48
Docket No. 90051 Respondent also determined an addition to tax of $53.63 pursuant to section 6654 of the Internal Revenue Code of 1954[2] in Docket No. 90037. The only issue to be determined is whether the petitioners received ordinary income rather than capital gains from the sale of real property and mortgages on real property. [3] *156 Findings of Fact George I. Bauman (hereinafter sometimes referred to as "Bauman") and Esther E. Bauman, husband and wife, reside at 225 Eastern Parkway, Brooklyn, New York. They filed joint Federal income tax returns for 1954 and 1955 with the district director of internal revenue at Brooklyn. Julius Schnapper (hereinafter sometimes referred to as "Schnapper") and Lillian Schnapper, husband and wife, reside at 144-16 70th Road, Kew Gardens, New York. They filed joint Federal income tax returns for 1954 and 1955 with the district director of internal revenue at Brooklyn. Benjamin Mallamud (hereinafter sometimes referred to as "Mallamud") and Evelyn Mallamud, husband and wife, reside at 3341 Reservoir Oval, Bronx, New York. They filed joint Federal income tax returns for 1954 and 1955 with the district director of internal revenue for the Lower Manhattan district. John J. Vogrin (hereinafter sometimes referred to as "Vogrin") and Madeline Vogrin, husband and wife, reside at 20 Joseph Lane, East Norwich, New York. They filed their joint Federal income tax return for 1955 with the *157 district director of internal revenue for the Lower Manhattan district. Willard S. Gourse (hereinafter sometimes referred to as "Gourse") resides at 311 East 72nd Street, New York, New York. He filed his Federal income tax return for 1955 with the district director of internal revenue for the Lower Manhattan district. Arthur E. Buchwald (hereinafter sometimes referred to as "Buchwald") resides at 823 Park Avenue, New York, New York. He filed his Federal income tax returns for 1954 and 1955 with the district director of internal revenue for the Upper Manhattan district. Hyman Ratner and Joseph Alliger (hereinafter sometimes referred to as "Ratner" and "Alliger," respectively) each owned 50 percent of Sterling Investing Corporation, hereinafter sometimes referred to as "Sterling." Sterling was a dealer in real estate and mortgage securities. Bauman, Schnapper, and Buchwald were vice presidents of Sterling during the years involved herein. Bauman had been an employee of that corporation for several years. His primary responsibility was negotiation of purchases and sales of mortgage bonds. Schnapper was also Sterling's house counsel and had been employed by it since 1943. Buchwald had *158 been employed by Sterling since 1942. Mallamud was Sterling's treasurer and general manager during the years involved herein. He had been an employee of Sterling since about 1932. Vogrin and Gourse were employed by Benjamin Hill & Company as securities traders. They were equal members of the partnership of Gourse and Vogrin (hereinafter sometimes referred to as "the partnership") during the years involved herein. Both Vogrin and Gourse were licensed real estate brokers during the years before us. The partnership's principal activity was real estate brokerage. Sterling Special No. 1 (hereinafter sometimes referred to as "the first joint venture") organized in 1952, was comprised of the following members: Ratner, Alliger, Mallamud, Schnapper, Bauman, and Buchwald. (One Samuel Rosenblum apparently took Alliger's place in the first joint venture some time in 1954.) Hyman Ratner Special Investment Account No. 2 (hereinafter sometimes referred to as "the second joint venture"), organized April 17, 1953, was comprised of the same members as the first joint venture. Hyman Ratner Special Investment Account No. 2A (hereinafter sometimes referred to as "the third joint venture"), organized in *159 1953, was comprised of the partnership plus the six members of the first and second joint ventures. There were no written agreements between the members of the three joint ventures. All the members usually participated in decisions to buy or sell property. Title to all the properties held by the joint ventures was taken in the name of Standard Properties, Inc., the only stockholders of which were Alliger and Ratner. The only business office of the three joint ventures was Sterling's office, located at 42 Broadway, New York, New York. The first joint venture was created in order to facilitate mutual investment in stocks, bonds, mortgages, mortgage certificates, and other properties. Its members made their capital contributions in cash. In June 1953 the first joint venture acquired a mortgage on a building at 1549 Prospect Place, Brooklyn, New York, which contained 20 apartments and two stores. The mortgage later was in default, and the first joint venture acquired a deed in lieu of foreclosure. An offer was made through brokers by Clifton Antley (hereinafter sometimes referred to as "Antley") to purchase the Prospect Place property. Antley made several increasingly favorable offers *160 until finally the first joint venture decided to accept. In August 1954 the property, which then had a basis of $47,320.51, was sold for $62,231.45. A mortgage on that property was acquired by the first joint venture and sold (all during August 1954) at a profit of $130.60. The second joint venture was organized to exploit an opportunity to purchase a group of rental properties, as a "package deal," from an estate. The transaction was presented through Vogrin and Gourse, as brokers. The properties so purchased consisted of an apartment house group on 8th Avenue in Manhattan, approximately 50 two-family cold water houses in Brooklyn, and one mortgage. The 8th Avenue property consisted of seven or eight joined apartment houses, each containing 15 to 20 apartments, all of which were rented. The property covered an entire block front. The apartment buildings had only one boiler. After acquisition a new oil burner system was installed to provide more efficient heating. Repairs and painting were done. The two-family cold water houses in Brooklyn were cheap properties. They were largely or fully rented but were operated at a loss for the fiscal year ended February 28, 1955. The funds to finance *161 the second joint venture were derived from bank loans made by Ratner and Alliger for themselves and the other joint venturers. Eleven of the properties (including one mortgage) purchased from the estate were sold shortly after acquisition. In the following year eight properties (including one mortgage, purchased two months prior to its sale) were sold. In the fall of 1954, the second joint venture still owned at least eleven houses on Pacific Street and at least nine on Dean Street in Brooklyn. Substantially all of these houses had "For Sale" signs on them. Pursuant to contract, Vogrin and Gourse received, as their compensation for presenting this opportunity to the second joint venture, the following: 1. the right to purchase three specified properties at cost; 2. a one-half interest in fifteen specified properties acquired from the estate; and 3. $65,000 in cash. The 15 properties in which Vogrin and Gourse acquired a half interest were transferred to the third joint venture, which was created in order to segregate the properties in which Vogrin and Gourse had an interest. As provided by the contract Vogrin and Gourse purchased from the second joint venture: 220 E. 74th Street, New *162 York City, for $30,000; 1589 Bushwick Avenue, Brooklyn, New York, for $3,500; and 88 Vanderveer Street, Brooklyn, New York, for $3,000. Immediately upon this transfer, the 1589 Bushwick Avenue property was turned over at cost to Vogrin's father, and the 88 Vanderveer Street property was turned over at cost to Vogrin's brother. Vogrin's father and brother use these properties as their homes. Vogrin and Gourse sold the 220 E. 74 Street property within a year after they acquired it. Also under the contract Vogrin and Gourse received deeds of a one-half interest in each of the following Brooklyn properties: 1442, 1591, 1599 Bushwick Avenue; 72 Somers Street; 102 Vanderveer Street; 116, 118 Hull Street; and 644, 648, 650, 656, 660, 662, 664, 666 Chauncey Street. All of these properties were subject to mortgages. These properties were then held jointly by the partnership and Standard Properties, Inc., and became assets of the third joint venture. The houses in which Vogrin and Gourse thus acquired a one-half interest were very old but in a fair state of repair. They were two-family cold water houses, each apartment having three or four rooms. These properties were managed by Mallamud and *163 Ratner. Rents were being paid thereon. The properties were all sold by October 1954, having been held by the third joint venture for periods ranging from six months to 13 months. The acquisitions and sales of real property and mortgages on real property by the three joint ventures included at least the following: First Joint Venture
Acquired
Sold
174 St., Flushing
Apr. 10, 1953
May 26 to
Aug. 10, 1953
Mtg.
Sept. 30, 1953
Nov. 10, 1953
Mtg. 233 Troy Ave., Bkln.
Oct. 1953
Jan. 22, 1954
Mtg. South Berry
1952
Aug. 1954
1549 Prospect Pl., Bkln.
June 1953
Aug. 1954
Mtg. 1549 Prospect Pl., Bkln.
Aug. 1954
Aug. 1954
Mtg. 14 Christopher St.
Oct. 1954
Dec. 1954
Mtg. 416-18 W. 23 St.
Nov. 4, 1953
Jan. 1955
Mtg. 2107 Daly Ave.
Feb. 10, 1954
Oct. 1955
Mtg. 116 E. 57 St.
Dec. 1954
Nov. 1955
Second Joint Venture
7 E. 129 St., Man.
June 30, 1953
June 30, 1953
2906 Eighth Ave., Man.
July 1, 1953
July 1, 1953
739-41 E. 6 St., Man.
July 8, 1953
July 8, 1953
Mtg. Crescent St., L. I.
June 30, 1953
July 16, 1953
117352 St., Bkln.
July 29, 1953
July 29, 1953
555 W. 184 St., Man.
July 30, 1953
July 30, 1953
6750-52 Fifth Ave., Bkln.
July 30, 1953
July 30, 1953
283-5 E. 4 St., Man.
Aug. 18, 1953
Aug. 18, 1953
62-64 Leroy St., Man.
Aug. 31, 1953
Aug. 31, 1953
88 Vanderveer St., Bkln.
Sept. 3, 1953
Sept. 3, 1953
1589 Bushwick Ave., Bkln.
Sept. 3, 1953
Sept. 3, 1953
* 2470-82 Eighth Ave., Man.
July 31, 1953
Mar. 16, 1954
1745 Dean St., Bkln.
Sept. 9, 1953
Mar. 17, 1954
1770 A. Pacific St., Bkln.
Sept. 9, 1953
May 14, 1954
Mtg. 1574 Webster Ave.
Mar. 29, 1954
June 3, 1954
1765 Dean St., Bkln.
Sept. 9, 1953
June 15, 1954
1790 A Pacific St., Bkln.
Sept. 9, 1953
Aug. 2, 1954
1757 Dean St., Bkln.
Sept. 9, 1953
Aug. 3, 1954
1758 Pacific St., Bkln.
Sept. 9, 1953
Nov. 1, 1954
1766 Pacific St., Bkln.
Sept. 1953
1766A Pacific St., Bkln.
Sept. 1953
1768 Pacific St., Bkln.
Sept. 1953
1770 Pacific St., Bkln.
Sept. 1953
1772 Pacific St., Bkln.
Sept. 1953
1774 Pacific St., Bkln.
Sept. 1953
1792 Pacific St., Bkln.
Sept. 1953
1794 Pacific St., Bkln.
Sept. 1953
1796 Pacific St., Bkln.
Sept. 1953
1796A Pacific St., Bkln.
Sept. 1953
1743 Dean St., Bkln.
Sept. 1953
1747 Dean St., Bkln.
Sept. 1953
1749 Dean St., Bkln.
Sept. 1953
1751 Dean St., Bkln.
Sept. 1953
1753 Dean St., Bkln.
Sept. 1953
1755 Dean St., Bkln.
Sept. 1953
1759 Dean St., Bkln.
Sept. 1953
1761 Dean St., Bkln.
Sept. 1953
1763 Dean St., Bkln.
Sept. 1953
Third Joint Venture
650 Chauncey St., Bkln.
Sept. 9, 1953
Mar. 12, 1954
1591 Bushwick Ave., Bkln.
Sept. 9, 1953
Mar. 15, 1954
644 Chauncey St., Bkln.
Sept. 9, 1953
Mar. 16, 1954
664 Chauncey St., Bkln.
Sept. 9, 1953
Mar. 30, 1954
1599 Bushwick Ave., Bkln.
Sept. 9, 1953
Apr. 1, 1954
1442 Bushwick Ave., Bkln.
Sept. 9, 1953
Apr. 2, 1954
666 Chauncey St., Bkln.
Sept. 9, 1953
Apr. 27, 1954
102 Vanderveer St., Bkln.
Sept. 9, 1953
May 20, 1954
660 Chauncey St., Bkln.
Sept. 9, 1953
May 21, 1954
662 Chauncey St., Bkln.
Sept. 9, 1953
May 25, 1954
116 Hull St., Bkln.
Sept. 9, 1953
May 27, 1954
648 Chauncey St., Bkln.
Sept. 9, 1953
July 21, 1954
656 Chauncey St., Bkln.
Sept. 9, 1953
July 21, 1954
72 Somers St., Bkln.
Sept. 9, 1953
Aug. 2, 1954
118 Hull St., Bkln.
Sept. 9, 1953
Oct. 4, 1954
*164 The three joint ventures reported the following capital gains and rental and interest income on their Federal income tax information returns: Rental and
Interest Income
Capital Gain
First joint venture 1953
[4,185.10)
$ 6,662.00
1954
(2,087.55)
17,016.54
1955
2,902.51
1,938.99 *
Second joint venture 2-28-54
4,763.60
5,468.02 **
2-28-55
(7,700.89) ***
88,598.56
Third joint venture 2-28-55
(2,682.04)
32,039.67
The acquisitions and sales of real property and mortgages on real property by the petitioners other than through the three joint ventures included at least the following: Acquired
Sold
Mallamud
Mtg. 1133 Southern Blvd., Bronx
Apr. 15, 1952
Mar. 12, 1954
Mtg. 17 W. 134 St., Man.
Nov. 23, 1949
Jan. 4, 1954
Mtg. 140 W. 92 St., Man.
June 1, 1950
Oct. 31, 1955
Mtg. 1369 Lyman Pl., Bronx
Oct. 26, 1950
Nov. 14, 1955
Vogrin *
Mtg. 459 E. 95 St.
Aug. 19, 1955
Aug. 19, 1955
Mtg. 1479 Flatbush Ave.
Nov. 22, 1954
Mar. 25, 1955
Mtg. 375 Clinton St.
Apr. 19, 1955
Dec. 22, 1955
Mtg. 650 Chauncey St., Bkln.
Mar. 1, 1955
Sept. 12, 1955
Gourse *
Mtg. 375 Clinton St.
Apr. 19, 1955
Dec. 22, 1955
Mtg. 1479 Flatbush Ave.
Nov. 22, 1954
Mar. 25, 1955
Mtg. 459 E. 95 St.
Aug. 19, 1955
Aug. 19, 1955
Mtg. 650 Chauncey St., Bkln.
Mar. 1, 1955
Sept. 12, 1955
Buchwald
220 E. 74 St.
May 11, 1954
June 8, 1954
Mtg. 46 E. 83 St.
Jan. 1955
May 1955
51 W. 9 St.
Aug. 11, 1955
Oct. 24, 1955
*165 For the years before us the members of the three joint ventures reported the following net capital gains from those ventures and the following other income: Joint Venture
Capital
Other In-
Gains
come *
Bauman
1954
$ 2,729.04
$14,376.37
1955
11,766.55
13,774.50
Schnapper
1954
2,784.73
8,166.65
1955
11,766.65
17,712.99
Mallamud
1954
4,332.87
20,478.01
1955
18,172.93
20,376.48
Vogrin
1955
8,009.92
8,445.49
Gourse
1955
8,009.91
19,748.90
Buchwald
1954
2,870.35
12,278.44
1955
11,766.55
9,077.53
Prior to 1953 Mallamud had never owned any real estate. Prior to 1954 Schnapper had never owned any real estate other than his own home. Each of the joint ventures held the property sold by it during the years before us for sale to customers in the ordinary course of its trade or business. Opinion Petitioners maintain that the properties sold by the joint ventures were capital assets and the gains on those sales are taxable as capital gains. [4] Respondent maintains that the property *166 was held by the joint ventures for sale to customers in the ordinary course of their trades or businesses and consequently the gains arose from the sale of non-capital assets. Sec. 1221(1). [5] *167 We agree with respondent. Preliminarily we are faced with a problem of classification. The parties use the terms "partnership," "joint venture," "syndicate," and "account" almost interchangeably. The parties seem to agree that, in any event, the entities are to be taxed as partnerships. Sections 761(a) and 7701(a)(2). It has not been suggested that the exact nature of the entities might affect any decision to be entered herein. Since the entities are described as joint ventures on their Federal income tax information returns, we use the term "joint ventures" to describe those entities in our opinion and findings of fact. There is further uncertainty as to whether tax consequences depend upon the character of the sold properties in the hands of the joint ventures rather than the character that the properties would have had in the hands of the joint venturers. Respondent states that this question was raised by petitioners' brief. In his reply, respondent contends that our only proper concern is with the business purpose of the joint ventures. We read petitioners' brief as a contention that neither *168 the joint ventures nor the individuals held the property for sale to customers in the ordinary course of their trades or businesses. The problem of whether we look to the joint venture or the joint venturer to determine the tax character of property arises from the ambiguous language of Sec. 702. [6] *169 Compare Willis, Handbook of Partnership Taxation 38-39 (1957) and Fishback v. United States, 215 F. Supp. 621, 625 (D. So. Dak. 1963) with Rosebrook v. United States, 191 F. Supp. 356, 358-359 (N.D. Cal. 1960), affd. 318 F. 2d 316 (C.A. 9, 1963). Compare the language of section 702, set forth in the margin, supra, with the relatively clear language of section 751(d)(2)[7] and section 1.1375-1(d), Income Tax Regs.[8] *170 Since we conclude that respondent must prevail under either approach, and since (although the question was raised) neither side has explored this question on brief, we will not undertake to resolve the dispute regarding the meaning of section 702. It is undisputed that the properties were held by joint ventures (or similar entities defined for tax purposes as partnerships) of sufficient vitality to be required to file information returns. Cf. Rosebrook v. United States, supra; Katherine Anne Berryman, 37 T.C. 45 (1961). Although several of the petitioners have testified that their purpose in entering the joint ventures and in acquiring the properties *171 was to provide them with an additional source of steady income, the income tax returns that they and the entities filed did not show such steady income Sale of some of the items was described to us as a consequence of unexpected management difficulties. Despite such difficulties, almost every property was sold at a profit. We think it unlikely that rental properties and mortgages could be sold so consistently at profits by people who had purchased the properties only for rental and interest income and who found quite soon that such income was either disappointingly low or nonexistent. For years other than those described in tables set forth in the findings of fact, we have little evidence as to purchases and sales and no evidence as to the relative income from rentals or interest on the one hand and sales on the other. On the basis of the limited evidence before us, including the frequency of sales soon after acquisition, we conclude that all three joint ventures held property for sale to customers in the ordinary course of their trades or businesses. Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955); Burnet v. Harmel, 287 U.S. 103, 106 (1932). The individuals present an *172 even more vague picture. This results not from the evidence being equipoise, but rather from a lesser amount of evidence. Testimony as to the individuals' purposes in holding the property is belied by the evidence described in the immediately preceding paragraph. Mallamud, Vogrin, Grouse, and Buchwald sold other real estate or real estate mortgages during the years before us. All the joint ventures usually particpated in the decisions to buy and sell. Once again we have almost no information as to their activities in years other than those before us. We conclude that petitioners have sustained neither their burden of persuasion nor their burden of coming forward with evidence. Decisions will be entered for the respondent. Footnotes
1. Proceedings of the following petitioners are consolidated herewith; Julius Schnapper and Lillian Schnapper, Docket No. 90037; Benjamin Mallamud and Evelyn Mallamud, Docket No. 90038; John J. Vogrin and Madeline Vogrin, Docket No. 90039; Willard S. Gourse, Docket No. 90040; and Arthur E. Buchwald, Docket No. 90051.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
3. The amounts of medical expense deductions allowable in Docket No. 90036 and 90040 depend upon our decision on the ordinary income - capital gain issue.
*. It is not clear whether the sale of the property described as 2472 Eighth Avenue effected a sale of the entire 2470-82 Eighth Avenue block.↩
*. $2,110 less $171.01 costs incurred in 1955 on account of a 1953 sale. ↩
**. $70,468.02 less $65,000 commission to Vogrin and Gourse for arranging the "package deal" purchase described supra. ↩
***. $7,267.89 net loss plus $433 repairs, painting, and "general expense" incurred on account of property sold in September 1953.↩
*. The Chauncey St. mortgage was held by the partnership. It is not clear whether the other mortgages were held by Vogrin and Gourse individually or by the partnership.↩
*. In the case of joint returns, amounts clearly income of the nonmembers' wives have been excluded.↩
4. Petitioners state their argument in terms of asets held by the joint ventures for more than six months and state the question before us in terms only of the buildings sold by the joint ventures. It appears that short-term capital gains, under the circumstances of these consolidated cases, would be taxed the same as income from the sale of non-capital assets. It also appears from the pleadings that the treatment of gain from the sales of mortgages on real property has been placed in issue. We will treat the case as one concerning the capital nature of all the properties sold by the joint venture. ↩
5. SEC. 1221. CAPITAL ASSET DEFINED. For the purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
6. SEC. 702. INCOME AND CREDITS OF PARTNER. (a) General Rule. - In determining his income tax, each partner shall take into acocunt separately his distributive share of the partnership's - * * *
(2) gains and losses from sales or exchanges of capital assets held for more than 6 months, * * *
(b) Character of Items Constituting Distributive Share. - The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (8) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership. 7. SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS [as amended by P.L. 87-834, § 14(b)(2), 76 Stat. 1041 (October 16, 1962)] * * *
(d) Inventory Items Which Have Appreciated Substantially in Value. - * * *
(2) Inventory Items. - For purposes of this subchapter the term "inventory items" means - (A) property of the partnership of the kind described in section 1221(1), * * *
(D) any other property hled by the partnership which, if held by the selling or distributee partner, would be considered property of the type described in subparagraph (A), (B), or (C). ↩
8. § 1.1375-1 Special rules applicable to capital gains. * * *
(d) Leval for determining character of gain. Ordinarily, for purposes of determining whether gain on the sale or exchange of an asset by an electing small business corporation is capital gain, the character of the asset is determined at the corporate level. However, if an electing small business corporation is availed of by any shareholedr or group of shareholders owing a substantial portion of the stock of such corporation for the purpose of selling property which in the hands of such shareholder or shareholders would not have been an asset, gain from the sale of which would be capital gain, then the gain on the sale of such property by the corporation shall not be treated as capital gain. For this purpose, in determining the hcaracter of the aset in the hands of the shareholder, the activities of other electing small business corporations in which he is a shareholder shall be taken into consideration.